**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

FILED
IN CLERKS OFFICE

2002 SEP 12 P 1: 53

U.S. DISTRICT COURT
DISTRICT OF MASS.

---

PAMELA MACRAE,

      Plaintiff,

v.

ORACLE CORPORATION, LAWRENCE J.
ELLISON, JOHN NUGENT, JOHN T.
REYNOLDS, JR., and JOHN BOUCHER,

      Defendants.

---

Civil Action No. 02-11773NG

---

**DEFENDANTS ORACLE CORPORATION, LAWRENCE J. ELLISON**
**AND JOHN NUGENT'S  MEMORANDUM IN SUPPORT OF THEIR**
**MOTION TO DISMISS COUNT IV OF THE COMPLAINT**

### I. Introduction

Defendants Oracle Corporation, Lawrence Ellison and John Nugent  (collectively

"Oracle"), have moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Count IV of Plaintiff

Pamela MacRae's ("MacRae") Complaint ("Complaint").  Count IV suffers from fatal legal

defects that mandate its dismissal.  MacRae asserts that Oracle's failure to pay her certain

commissions constitutes a violation of the Massachusetts Payment of Wages Statute, G.L. c. 148,

§ 149 (the "Wage Statute").  The disputed commissions fall outside the coverage of the Wage

Statute, precluding MacRae from stating a viable claim.  MacRae has also failed to satisfy the

statutorily mandated prerequisite to bringing this action by filing a complaint with the Office of

the Attorney General.  For both reasons, Count IV should be dismissed with prejudice.

### II. Statement of Facts and Allegations

Oracle hired MacRae in January, 2000, to work in its Waltham, Massachusetts branch

office as a Technology Sales Manager, Level III in Oracle's General Business Unit.[1]  (Complaint,

¶ 10).  She was paid a base salary of $82,800 (Complaint, ¶ 11; See Also Oracle offer letter to

MacRae, attached as Exhibit A[2]).  In addition, MacRae participated in a compensation plan that

included the ability to earn commissions.  (Complaint, ¶ 11).  The commissions were based on

attainment against an annual sales quota and were generally paid approximately four weeks after

the end of the month during which a sale occurred, although the compensation plan does not

specify a date for payment of commissions.  (Fiscal Year 2001 Oracle Americas Compensation

Plan, attached as Exhibit B, Appendix 5).  Of course, if no sale were closed during a particular

month, no commission would be earned.

MacRae alleges that she was entitled to receive commissions for sales to three accounts

(DeWolfe Companies, Perkin Elmer and Converge)  that became due and owing to her on June

20, 2001, and that Oracle failed to pay her these commissions.  (Complaint, ¶ 25).  MacRae

contends that these commissions totaled $75,000.  (Complaint, ¶ 25).  Oracle disputes that

MacRae was entitled to commissions from these sales.  (Id.).

Count IV of the Complaint asserts a claim for the disputed commissions under G.L. c.

149, § 148 and seeks treble damages.  (Complaint ¶ 41 (D)).  Significantly, there is no allegation

---

[1] As this motion is brought under Fed. R. Civ. P. 12(b)(6), Oracle treats the allegations of MacRae's Complaint as true, but only for the purposes of this motion.  Oracle reserves the right to dispute any and all of MacRae's allegations.

[2]    Neither Exhibit A (MacRae's offer letter) nor Exhibit B (the Oracle compensation plan) in any way alters the procedural posture of this motion.  Documents central to a plaintiff's claim may be considered in connection with a motion to dismiss without converting the motion to one for summary judgment.  Fudge v. Penthouse International, Ltd., 840 F.2d 1012, 1015 (1st Cir. 1988).  It is not anticipated, in any event, that the information supplied by these documents -- the amount of MacRae' salary and the timing of commission payments -- will be disputed.

suggesting that MacRae sought relief with the Office of the Attorney General before bringing this

action, nor does Oracle have any reason to believe that such relief was sought.

### III. Discussion

**A.      The Disputed Commissions Are Not Subject to the Wage Statute**

The Wage Statute expressly limits the types of commissions that are recoverable under the

statute.  It provides in relevant part:

> This section shall apply, so far as apt, to the payment of commissions when the
> amount of such commissions, less allowable or authorized deductions, has been
> definitely determined and has become due and payable to such employee . . . .

G.L. c. 149, § 148.  The legislative intent of the statute was to restrict the types of commissions

recoverable to those that are paid on a weekly basis.  The section of the Wage Statute that

addresses commissions was inserted into the statute under the caption: "An Act relative to the

**weekly payment** of commissions due to certain employees." Commonwealth v. Savage, 31

Mass. App. Ct. 714, 716 (1991) (quoting St. 1943, c. 467) (third paragraph) (emphasis added);

see Commonwealth v. Jarrett, 359 Mass. 491, 495 n.5 (1971) (the title of an act is part of it and is

relevant as a guide to legislative intent).

In view of this language and legislative intent, it has become a well established principle

that many commission payments, including some of the most ordinary forms of commissions, fall

outside the purview of the Wage Statute.  As the Massachusetts Appeals Court stated in

Commonwealth v. Savage, referring to the section of the Wage Statute that addresses

commissions:

> From the caption to that act and from the placement of the provision in the weekly
> payment statute, one infers a Legislative purpose to assist employees who would
> ordinarily be paid on a weekly basis, such as retail salespeople, and **for whom**

3

**commissions constitute a significant part of weekly income**.

31 Mass. App. Ct. 716 (emphasis added). Thus, the court confirmed that commissions are not recoverable under the Wage Statute unless they are part of an employee's regular, weekly income. Id.

Put another way, the only commissions recoverable under the Wage Statute are those paid on a predictable, regular basis throughout the year, and which constitute a significant part of the employee's weekly income in the same way as his or her salary. Id. See also, Baptista v. Abbey Healthcare Group, Inc., 1996 WL 33340740 (D. Mass. 1996)("the only impression that can possibly be derived from [the Wage Act], is that its intent is to protect laborers and casual wage earners who might otherwise be vulnerable to employer intimidation.").

This limitation on the Wage Statute's reach has frequently been invoked to dismiss claims almost identical to MacRae's in both state and federal court. In Savage, for example, the Massachusetts Appeals Court found that real estate brokers' commissions were not subject to the Wage Statute. The commissions in dispute were not part of the real estate brokers' regular weekly income. Id. The court concluded that the real estate transactions giving rise to the commissions were "episodic" rather than "regular," and that, therefore, the commissions were not subject to the Wage Statute.[3] Id.

Drawing from the Massachusetts Appeals Court's decision in Savage, a similar conclusion was reached in Doherty v. American Medical Response of Massachusetts, Inc., 7 Mass. L. Rptr.

---

[3]        It should be noted that the court in Savage also found that the Wage Statute was inapplicable because the brokers were independent contractors. 31 Mass. App. Ct. at 717. Still, the court made clear that the episodic nature of the commissions alone precluded recovery under the Wage Statute. Id.

No. 31, 725 (February 23, 1998) (copy attached as Exhibit C). The plaintiff, who was an emergency vehicle salesman, was entitled to commissions in addition to his regular, weekly salary. However, the nature of the business was unpredictable, making it impossible to determine and pay commissions on anything approaching a regular, much less a weekly, basis. Accordingly, although the plaintiff had entered into a contract that specified a method for calculating commissions, the court found that the commissions were not subject to the Wage Statute. Id.

Numerous other courts have reached a similar conclusion, including: Cumpata v. Blue Cross Blue Shield of Massachusetts, 113 F. Supp. 164 (D. Mass. 2000); Okerman v. VA Software Corporation, (Mass.Super.2002)(copy attached as Exhibit D); Huebsch v. Katahdin Industries, 13 Mass.L.Rptr. 180 (Mass.Super. 2001)(copy attached as Exhibit E); Locke v. Sales Consultants of Boston, Inc., 13 Mass.L.Rptr. 164 (Mass.Super. 2001)(copy attached as Exhibit F); Dennis v. Jager, Smith & Stetler, P.C., 11 Mass.L.Rptr. 567 (Mass.Super. 2000)(copy attached as Exhibit G).

Against this precedent MacRae's commission claim under the Wage Statute cannot survive. MacRae was paid a generous monthly salary of $ 6,900. Her commissions were both episodic and substantial. See Savage, 31 Mass. App. Ct. at 716 (real estate brokers not entitled to bring commission claim under Wage Statute because commissions were episodic and substantial). MacRae's commissions were not part of a weekly salary, much less the "significant part of weekly income" required by the court in Savage. 31 Mass. App. Ct. at 716. Instead, the commissions were generally calculated some time after the month in which the sale occurred (if a sale occurred) and, therefore, were paid on an entirely unpredictable, irregular basis. (See Ex. B, ¶ 5B). This is plainly not the type of commissions that either the legislature or the courts

5

contemplated would be recoverable under the Wage Statute.  Count IV should be dismissed for failure to state a claim upon which relief can be granted.

**B.      Plaintiff Has Not Satisfied the Statutorily Mandated Prerequisite to Bringing an Action under the Wage Statute**

Beyond the legal defects of MacRae's Wage Statute claim, MacRae has also failed to satisfy a necessary procedural prerequisite.  The Wage Statute provides that before commencing a civil action for unpaid wages or vacation pay, an employee must file a complaint with the Attorney General's Office.  M.G.L. c. 149, § 150; see also Moriearty, Adkins & Lipsitz, Massachusetts Practice: Employment Law, Vol. 45, § 14.9 (1995).  This well settled principle was reiterated in Daly v. Norton Company, 10 Mass. L. Rptr. No. 29, 674 (January 10, 2000) (copy attached as Exhibit H).  The court in Daly dismissed a claim under the Wage Statute where the plaintiff had not first filed a complaint with the Attorney General's Office.  The court held that "Massachusetts law mandates that all compensation claims must be filed with the Office of the Massachusetts Attorney General before any court may adjudicate such claims."  Id.

Count IV should be dismissed for this reason as well.  MacRae, too, did not first seek the approval of the Attorney General's Office before filing suit.  There is no allegation or evidence to suggest that she has done so since.

### IV.  Conclusion

For all of the foregoing reasons, Oracle's Motion to Dismiss Count IV of Plaintiff's Complaint should be granted and Count IV should be dismissed with prejudice[4].  **As a necessary**

---

[4]       The Court should be aware that MacRae's Employment Agreement contains an arbitration provision, and that, following the Court's resolution of this motion, Oracle intends to move to compel arbitration.  The court, in any event, has jurisdiction over this matter and should decide the motion to dismiss Count IV before compelling arbitration, thereby narrowing the actual

result, Defendants Ellison and Nugent should be dismissed from this lawsuit, as Count IV was the sole basis for their inclusion.

Respectfully submitted,

ORACLE CORPORATION, LAWRENCE J. ELLISON and JOHN NUGENT,

By their attorneys,

Keith H. McCown (BBO #329980)
Allison K. Romantz (BBO #554909)
Morgan, Brown & Joy, LLP
One Boston Place
Boston, MA 02108
(617) 523-6666

Dated: September 12, 2002

dispute between the parties.

## CERTIFICATE OF SERVICE

I certify that this 12th day of September, 2002, a true and accurate copy of theoregoing document was served, by first class mail, postage prepaid on Todd A. Newman, Hanify & King, One Beacon Street, Boston, MA 02108.

Allison K. Romantz

8

# EXHIBIT

# A

ORACLE®          Oracle Corporation        500 Oracle Parkway          phone    ( ) 506.7000
                                           Redwood Shores             fax       ( ) 506.7200
                                           California 94065


December 23, 1999


Ms. Pamela M. MacRae
311 Salem Road
Billerica, MA 01821


Dear Pamela,

We are pleased to offer you the position of Territory Systems Manager III with Oracle Corporation.
We offer you starting compensation at the monthly rate of $6,900.00 (equivalent to an annual rate of
$82,800.00). In addition, you will be eligible to participate in the standard compensation plan for your
position. Your on-target earnings, at 100% achievement of your defined goals for the year, will be
$160,000.00.

You will also be eligible to participate in our standard automobile program for this position. Under the
current program you will receive an automobile allowance of $600.00 per month.

To accept this offer, please sign the enclosed Employment Agreement (be sure to confirm your intended
start date), the Proprietary Information Agreement and all other documents required by Oracle and return
them to the attention of FESCO/Oracle, One Spartan Way, Mailzone TS1A, Merrimack, NH 03054-
9600. Please send the Benefits Authorization Form to Oracle Benefits at 500 Oracle Parkway, MS
LGN-1, Redwood Shores, CA 94065. Employment and employee benefits can only begin after you
have signed these documents and they have been received by our Employee Service Center. If you have
any questions regarding these documents, please feel free to call our Employee Service Center at
(800) 410-2363.

If you have any questions regarding the conditions of your offer, please feel free to call your manager,
Kevin Kennefick, at (781) 684-6960 or your Human Resources Representative, Mary Jacobsen, at
(248) 816-6498. This offer remains open until January 23, 2000. We look forward to having you
begin work with us.

Sincerely,

*Joyce Westerdahl*

Joyce Westerdahl
Vice President, Human Resources

Enclosure: New Employee Packet

# EXHIBIT

# B



**FY01 Sales Compensation Terms & Conditions**
**June 1, 2000**

**North America**
**Version 1.2**

FY01 Sales Compensation Terms & Conditions – North America

## Contents                                                                    Page

| I. | General | 2 |
|---|---|---|
| II. | Administration and Approvals | 2 |
| III. | Commissions | 3 |
| IV. | Bonuses | 4 |
| V. | Quotas, On-Quota Dates, and Effective Dates | 4 |
| VI. | Account & Territory Listings | 4 |
| VII. | Quota Club | 5 |
| VIII. | Termination and Internal Transfers | 5 |

| Appendix 1 | Definitions | 7 |
|---|---|---|
| Appendix 2 | Quota Credits & Bonuses - License Sales | 9 |
| Appendix 3 | Quota Credits & Bonuses - Support Sales | 14 |
| Appendix 4 | Quota Credits & Bonuses - Education Sales | 16 |
| Appendix 5 | Approved Local Variations | 19 |
| Appendix 6 | Translation of Key Words | 24 |
| Appendix 7 | Business Initiatives Template | 26 |

FY01 Sales Compensation Terms & Conditions – North America

## I. General

A. Compensation Plan ("the Plan") consists of (1) this document ("Compensation Plan Terms and Conditions") and (2) the individualized Compensation Plan. Reference to "the Company" is to the subsidiary of Oracle Corporation employing the salesperson. Signature of the individual Plan, either electronically by click acceptance or in writing, or acceptance of any commissions and/or bonuses payable under the Plan indicates acceptance of the Plan. This Plan covers transactions closed during the 2001 Fiscal Year from June 1, 2000 through May 31, 2001.

The Company agrees to:

- Pay compensation under the terms and conditions of the Plan.

The employee agrees to:

- Accept as full compensation the compensation paid under the Plan.
- Abide by published Company policies including these Terms and Conditions, the Code of Ethics and Business Conduct, the Proprietary Information Agreement and other employment and/or financial guidelines. These are available at: http://splan.us.oracle.com/ or locally as shown in Appendix 5.
- Repay advances against compensation that are not offset by compensation earned.

## II. Administration and Approvals

A. The Company shall make the final and binding determination of any amount payable under the Plan and reserves the right to adjust, modify or change the Plan at any time before a commission or bonus vests, either during or after the close of the fiscal year. Entitlement to commissions and bonuses does not vest until the Company makes any and all final determinations and adjustments, modifications or changes as authorized by the Plan. Adjustments, modifications and changes may be made to bonuses, commissions, commission rates, quotas, territories or any other terms and conditions and may result in a decrease or an increase in compensation. Such modifications to Plans are valid only if approved by the relevant Executive Vice President or his/her designee.

B. For any single transaction that generates quota credit equal to or greater than one-half the salesperson's annual quota, the Executive Vice President or his/her designee will review the transaction and determine appropriate treatment of the transaction. Appropriate treatment may include, but is not limited to, limiting the amount of quota credit, subjecting the commission to a different vesting schedule, limiting the amount of total quota attainment and/or limiting the amount of commission.

C. Commission and bonus payments are scheduled to be made in accordance with the local payment schedule shown in Appendix 5, but may be subject to change. Individual statements of payments are placed on the local sales planning web server or are otherwise made available in hard or soft copy to coincide with the commission and/or bonus payment. Upon receipt of the individual statement, any discrepancies must be brought to the attention of the local compensation department immediately, but in any event not more than two months after the statement was issued.

D. Products and services available for commission and bonus credit vary by sales position. The Product and Services Credit Allocation Matrix located at http://splan.us.oracle.com lists products and services by eligible sales position.

E. Products and services available for commission and bonus credit are limited to products and/or services that are in production and/or available locally. A sale not made in accordance with the FY01 Approval & Options Matrix, a sale of unauthorized products or a sale made pursuant to non-standard terms and conditions, including but not limited to unapproved pricing or unauthorized extended payment terms, side letters and discounts will not be a valid sale under the Plan and will

FY01 Sales Compensation Terms & Conditions – North America

result in the non-payment or recovery of commissions and/or bonus and the reversal of associated quota and/or bonus credit.

F. Employees may be eligible to receive commission and/or bonus credit for new and/or additional products and/or services during the fiscal year under established guidelines in which case they will receive separate written notification.

G. Advances against compensation may result in the employee incurring a negative compensation balance. Neither commission nor bonus payments will be made to employees who have incurred a negative balance until the entire negative balance has been offset in full by earned commissions and bonuses. The Company reserves the right to recover all advances against compensation that are not offset against commissions or bonuses earned. Only the relevant Executive Vice President or his/her designee, is authorized to forgive advances against compensation.

H. The Chairman and CEO, or his designee, shall have the final responsibility, authority and discretion in all matters of administration or interpretation of the Plan.

I. These Terms and Conditions are subject to revision. Notification of any revisions to these Terms and Conditions will be via electronic mail or in hard copy.

J. Compensation Plans in subsequent years will not necessarily have any association with those of prior years, but will reflect the Company's anticipated business objectives for the forthcoming year.

## III. Commissions

### A. Commission Rates

Quota or Sales Target is divided into performance tiers as shown in the individual Compensation Plan. Each tier has an associated commission rate.  Commissions are calculated on the basis indicated in Appendix 5.

### B. Commission/Bonus Recovery and Reinstatement

If a customer's account receivable becomes greater than the local limit for days past due as shown in Appendix 5, all prior commission, quota credits or bonus credits associated with the sale are recoverable ("clawed back") against current commissions or bonuses as shown in Appendix 5. This includes invoices for licenses financed by Oracle Financing Division (OFD). Commission or bonus recoveries may cause a negative compensation balance, which is considered an advance against compensation. Neither commission nor bonus payments will be made to employees with a negative compensation balance until the entire negative balance has been offset in full with earned commissions and bonuses.

Recovered quota credits ("clawbacks") result in a corresponding reduction in quota achievement in the month of recovery.

If the account is paid at a later date, commissions, quota credits/bonus credits are restored ("given back") at the original commission or bonus rates. If an account is credit memoed, or deemed uncollectable under the terms of the Company's accounting policies and written-off, all prior commissions, quota credits or bonus credits associated with the sale are recoverable against current commissions or bonuses at the original commission or bonus rates.

Commission and/or bonus payments are reinstated ("given back") if and when quota credits are restored.

### C. Commission Splits

FY01 Sales Compensation Terms & Conditions – North America

Any splits other than those outlined in these Terms and Conditions require the approval of the Executive Vice President or his/her designee in each territory affected. The total quota credit or bonus credit and commissions allocated among all salespeople in any split will not exceed 100%.

## IV. Bonuses

Bonuses, if applicable, are calculated based on the bonus rate shown on the individual Compensation Plan, or in accordance with any provisions described in Appendix 2, 3, or 4, as applicable.

### A. Business Initiatives Bonus

A Business Initiatives Bonus may be available for achievement of quarterly or semi-annual objectives. The list of goals/initiatives approved by a salesperson's manager must be on file with the Company's Compensation department prior to payment of the bonus. Performance ratings must be approved by the manager two levels above the employee being assessed. The Business Initiatives Bonus is based on a quarterly or semi-annual rating submitted and paid quarterly or semi-annually. Payment is year-to-date pro-rated and adjusted for prior quarters' payments. The Business Initiatives Bonus is capped at 125 points.

## V. Quotas, On-Quota Dates, and Effective Dates

Plans are based upon an annual quota that is divided into months. Salespeople may go on quota only on the first day of the month. Months are not prorated. The minimum quota amount for a salesperson going on quota for the first time after February 1, 2001 is four months worth of the annual quota for the territory, or with management approval, the salesperson may receive only the prorated quota for that position and the resulting commissions earned will be capped at 100% attainment of the prorated quota. To go on quota in a given month, a salesperson must be in that position no later than the 15th of the month.

Sales Consultants are covered by a Plan as soon as they begin employment as a Sales Consultant. The Sales Target for a Sales Consultant is based on the performance goals of the applicable group/region/country as shown in Appendix 5. A Sales Consultant's Bonus Pool Contributions will be prorated based on the Effective Date.

Employees on a paid or unpaid leave of absence, including but not limited to pregnancy disability leave or other short or long term disability leave, will not be eligible to earn commissions or bonuses during the leave. Quota will be adjusted downward to reflect the time on leave. The prior approval of the Executive Vice President or his/her designee is required for exceptional cases where an employee may be given the option to continue to carry quota and earn commissions or bonuses during a leave of absence.

## VI. Account and Territory Listings

Quota or bonus credit is given based on FY01 Account and Territory Listings in accordance with Sales Planning practices. A salesperson is eligible for quota credit or bonus credit only for accounts and territories listed under his/her name on the approved FY01 Account and Territory Listing.

Territory mappings and/or account listings may be modified during the fiscal year to reflect increased or decreased opportunity. The Company's Compensation Department must be notified immediately in writing of any change to a territory mapping and/or account listing and the affected employees' quotas may be adjusted.

## VII. Quota Club

Quota Club is an annual sales award to recognize the top Oracle sales personnel. Quota Club qualification criteria are shown on each eligible Compensation Plan.

FY01 Sales Compensation Terms & Conditions – North America

Quota Club is available only to those salespersons on a Club-eligible Plan at the end of the fiscal year who went on quota on or before February 1, 2001, have achieved at least six months of the annual quota and have achieved at least 100% of their year-to-date quota.

Quota Club is available only to Sales Consultants and Solutions Specialists on a Club-eligible Plan at the end of the fiscal year who went on their FY01 Plan on or before December 1, 2000.  The number of Sales Consultants and Solutions Specialists attending Quota Club will be determined by the performance against quota of their group.  Individual Sales Consultants and Solutions Specialists will be invited to attend based on management assessment of their personal contribution to the team's results.  A weighted average calculation is used to determine whether an eligible employee on more than one Plan during a fiscal year is eligible for Quota Club.

For any other employee on a sales compensation plan, eligibility for Quota Club is at the discretion of the Company and subject to Executive Vice President approval.

Salespersons, Sales Consultants and Solutions Specialists who qualify for Quota Club may only attend provided they are employed by the Company at the time of the award trip. Neither cash nor any other form of compensation will be paid in lieu of the award. The award may not be transferred to another employee in the event of a qualifying employee not attending Quota Club.

**VIII. Termination of Employment and Internal Transfers**

A. An employee's ability to earn commissions and bonuses under the Plan terminates on the employee's last date of employment with the Company or, where the employee is transferring to a different position, on the effective date of the transfer. Commissions subject to a different vesting schedule pursuant to Section II will cease to continue to vest and will not be paid following the employee's last date of employment or transfer date; no pro rata vesting will occur.  The final amount of any commissions and/or bonus due to an employee whose employment has ended, or who has transferred to a new position, is only that payable, pursuant to the terms and conditions of the Plan, up to and including the employee's termination date or transfer date.

B. Advances against compensation will not be paid after notice of an employee's intent to resign from the Company or to transfer to a position with a different compensation arrangement or after the Company gives notice of termination of employment to the employee.

C. Advances against compensation will be recovered against commissions and/or bonuses from an employee whose employment has terminated or has transferred to a position with a different compensation arrangement unless the advance is specifically non-recoverable.   Where any commissions and/or bonuses are insufficient to cover the amount owing, the employee will be required to make payment directly to the Company within 30 days of being notified of the amount owing.  Where an employee with an outstanding advance transfers to a different compensation arrangement, the advance will either be recovered from future variable pay where applicable, or a repayment plan will be agreed with the individual employee.

D. On termination of employment or transfer, quotas are not pro-rated.

E. Any quarterly bonus, including but not limited to Sales Consulting and Business Initiatives Bonuses will be paid only to an employee who is employed by the Company on the last day of the bonus period and is on an eligible Plan for at least 30 days of the bonus period.

F. Either the employee or the Company may terminate the employment relationship at any time and for any reason.   No one at Oracle is empowered, unless specifically authorized in writing by the Board of Directors, to make any promise, express or implied, that employment is for any minimum or fixed term, or that cause is required for termination of or change in the employment relationship.

FY01 Sales Compensation Terms & Conditions – North America

## Appendix 1: Definitions

| A | **Advances Against Compensation** | Any unearned compensation, unless specifically designated as non-recoverable, is considered a recoverable advance against compensation. Examples include unearned commissions resulting from credit memos, unearned bonuses resulting from credit memos, unearned wages and recoverable draws. |
|---|---|---|
| B | **Bonuses** | Bonuses are earned for the achievement of specified objectives and/or targets. |
| C | **Booking** | Purchase orders, engagement contracts and/or legally accepted modifications to contracts (as defined under the Company's revenue recognition policy) are considered bookings. They are only recognized to the extent that they are funded. Volume or blanket agreements (VPAs/BPAs) do not qualify unless an ordering document is provided with funding for services (i.e. a Statement of Work). |
| D | **Commissions** | Payments based on the attainment of quota or sales target goals. |
| E | **Consulting Margin** | Consulting Margin is defined as Consulting Revenue less Consulting costs. |
| F | **Country Manager Contribution** | Country Manager Contribution is defined as Licenses and Consulting Revenue less Licenses, Alliances and Consulting costs. |
| G | **Effective Date** | The Effective Date is the start date of a Sales Consulting Plan. Sales Consultants are covered by a Plan as soon as they begin employment as a Sales Consultant. |
| H | **iSD** | iSD stands for Internet Sales Division, formerly known as DMD (telesales). |
| I | **Licenses Margin** | Licenses Margin is defined as Licenses Revenue less Licenses and Alliances costs. |
| J | **On-Quota Date** | The start date of an individual Sales Plan. Salespeople may go on quota only as of the first day of a month. Months are not pro-rated. |
| K | **On-Target Earnings "(OTE)"** | On-target earnings "(OTE)" means base salary plus the level of variable income from both of the following elements:<br>• commission earned at 100% Quota performance plus<br>• the estimated amount of bonus if shown on the individual Compensation Plan<br><br>In some countries the definition of OTE also includes car allowance. Whether OTE includes car allowance in a particular country is clarified in Appendix 5. |
| L | **Revenue** | Revenue as posted into the country's General Ledger, for the relevant products and/or lines of business will count as revenue for purposes of quota credit. |
| M | **Revenue Growth** | The increase in revenue in a given fiscal year expressed as a percentage of the actual revenue recorded in the company's books in |

FY01 Sales Compensation Terms & Conditions – North America

the previous fiscal year.

| | | |
|---|---|---|
| N | **Swap out** | A deal where a customer has a contractual right to substitute one product for another from the product list current at the time of signing the order. |
| O | **Upon Booking** | At the time a transaction is recorded in the books of the Company, under the terms of the Company's accounting policies, regardless of the timing of revenue recognition. |
| P | **Upon Revenue Recognition** | At the time revenue is recognized as revenue in the General Ledger of the Company under the terms of the Company's accounting policies. |
| Q | **UPU** | UPU stands for Universal Power Unit |

FY01 Sales Compensation Terms & Conditions – North America

## Appendix 2: Quota Credits & Bonuses – License Sales

### I. Quota Credits

The following Quota credits apply to Field Licenses and iSD Sales.

1 **Field License Quota Credits**

- License Revenue (excluding CAP & Site Revenue)
  - Quota credit upon revenue recognition

- Credit Acquisition Plan (CAP)
  - 50% quota credit upon revenue recognition and 50% quota credit upon booking of drawdown order

- "Swap-outs"
  - 50% quota credit upon revenue recognition and 50% quota credit upon expiration of the "swap-out" period

- Oracle Exchange deals
  - quota credit will be given quarterly, in four equal amounts, beginning in the month that the deal closed

- Partner Sell-Through Revenue (new & drawdown)
  - 100% quota credit upon confirmation of the sale to the end-user

2 **iSD License Quota Credits**

- License Revenue under the local iSD order threshold (see Appendix 5)
  - credit upon revenue recognition

- License Revenue over the local iSD order threshold (see Appendix 5)
  - credit upon revenue recognition, calculated based on the revenue share matrix in Section E, below

- Partner Sell-Through Revenue (under the local iSD order threshold)
  - 100% credit upon confirmation of the sale to the end-user

3 **First Year Support Quota Credits**
  - 100% credit upon booking

### A. License Revenue

For compensation purposes License Revenue:
a) excludes Updates Subscription Service, which is considered as First Year Support and
b) is subject to a local minimum commissionable order value as shown in Appendix 5.

The amount of License Revenue is computed by taking the list price of the license sold, less:
   a) any discount or referral fee or partner margin or royalties;
   b) any lease interest rate buydown;
   c) and the full list value of any other included goods or services (e.g.; consulting, technical support, hardware or systems integration services, the services of any other Oracle employee).

Licenses Revenue from deals sold through Oracle Financing Division (OFD) will be reduced by a Net Present Value factor based on the lease term.  License revenue from deals with payment

FY01 Sales Compensation Terms & Conditions – North America

terms greater than 30 days which are not financed through OFD will also be reduced to adjust the deferred payment to a Net Present Value.

For field sales, Tutor and iLearning products booked will be credited under License Quota and paid as commission at the applicable commission rate. For iSD sales, Tutor and iLearning products booked will be paid as part of the Education bonus.

## B. Exchange Deals

Commission is paid at the rate applicable at the time the quota credit is given.

## C. Partner Sell-Through Revenue

Partner Sell-Through Revenue includes sublicense revenue on sales greater than the commercial list price shown in Appendix 5 generated through Original Equipment Manufacturers, Value Added Partners, Oracle Application Dealers, Value Added Distributors and other partners/distributors.

## D. iSD Deals above the iSD threshold

The following quota and commission credit will apply to iSD Telesales Reps for deals booked by iSD in excess of the iSD order threshold.

| License Price | iSD % of Quota and Commission Credit per increment |
|---|---|
| Increment 1(up to iSD threshold) | 100% |
| Increment 2 | 50% |
| Increment 3 | 40% |
| Increment 4 | 15% |
| Increment 5 | 8% |

The applicable increment scale is shown in Appendix 5.

## E. First Year Support

First Year Support includes the first twelve months of a new Updates Subscription Service, Bronze Product Support (existing contracts only), Oracle*Silver* Product Support, Incident Support and the underlying Oracle*Silver* component of Oracle*Gold*, at an assumed proportion of 75% of the Oracle*Gold*.

A salesperson may receive credit for the total amount of revenue to be recognized in the Company's accounting records for first year support. This credit rule applies only when the first year support is sold, a purchase order is obtained and the order is booked all within 30 days of the sale of the corresponding new license.

First Year Support booked includes all first year contracts sold with a new revenue full-use license sublicensed through an OEM, VAR or other partner/distributor, and does not include support renewal sales to an existing support customer site.

When customers with existing licenses and support purchase new licenses, the new license purchases are handled as separate transactions and the corresponding support is considered First Year. Support on existing licenses is not considered First Year Support.

Quota and commission credit for First Year Support booked for iSD deals above the iSD threshold will be subject to the same credit scale as is applicable to the corresponding License revenue, as outlined in this Appendix, section E.

## F. First Year Support Booked with Upgrades

FY01 Sales Compensation Terms & Conditions – North America

If licenses are upgraded within the first year of a new support booking, then the terminated or unused portion of the original support term is credit memoed and the salesperson is credited with the new, upgraded prorated support from the date of the upgrade to the expiration date of the new support term, not to exceed 12 months of credit in total from the start date of the original support term.

## G. Revenue Sharing

In summary, quota credit follows revenue credit. For direct deals 50% of the revenue credit follows sales effort (usually signing location); the other 50% is allocated based on UPUs/Users in territories. For indirect deals 25% of the revenue credit follows sales effort (usually signing location); the other 75% is allocated based on UPUs/Users in territories. See matrix below for details and Appendix 5 for local country variations.

| Sales Effort [1] | UPU/User Location | Example | Direct Revenue & Quota Credit [2] | Indirect Revenue & Quota Credit [3] |
|---|---|---|---|---|
| IN | IN | Sales effort occurs in your territory, all UPUs/Users located in your territory | 100% | 100% |
| IN | IN & OUT | Sales effort occurs in your territory, some UPUs/Users located in your territory, some located outside your territory | 100% for UPUs/Users in your territory, 50% for those outside | 100% for UPUs/Users in your territory, 25% for those outside |
| IN | OUT | Sales effort occurs in your territory, all UPUs/Users are located outside your territory | 50% | 25% |
| OUT | IN | Sales effort occurs outside your territory, all UPUs/Users are located in your territory | 50% | 75% |
| OUT | IN & OUT | Sales effort occurs outside your territory, some UPUs/Users located in your territory, some located outside your territory | 50% for UPUs/Users in your territory | 75% for UPUs/Users in your territory |
| OUT | OUT | Sales effort occurs outside your territory, all UPUs/Users located outside your territory | 0% | 0% |

[1] Sales effort is usually defined as signing location.
[2] Also applies to Indirect Revenue and Quota Credit within the local country.
[3] Applies only to Indirect Revenue and Quota Credit outside the local country.

## H. Account Transfers

Where there is a transfer of an account between salespersons, typically at the start of the fiscal year, quota, commission and/or bonus credit may be split on a transaction closed within three months of the transfer date as follows: 25% quota credit will be given to the previous account owner, 75% quota credit to the new account owner.

If applied, the same splits will apply up the management chain. The total quota and/or bonus credit will not exceed 100%. Any other splits require the approval of the Executive Vice President or his/her designee in each territory affected.

## I. Out of Territory Revenue

A salesperson will not be compensated for business signed and installed out of his/her designated territory.

FY01 Sales Compensation Terms & Conditions -- North America

## II. Bonuses

### A. Additional Bonuses

The following rates will apply to positions eligible for the applicable bonus:

| Positions | Business On Line | Education |
|---|---|---|
| **Prime Sales Positions**<br>Account Manager & Applications Sales Rep | 10% | - |
| **Internet Sales Positions**<br>Internet Sales Rep (Account & Apps Reps) | 5% | 1% |
| **Solutions Specialists** | - | - |
| **Sales Consultants** | - | - |
| **Sales Management** | - | - |
| **Other** | - | - |

The above additional bonuses will be credited and defined, where applicable, as follows:

| | Bonus | Credited | Description |
|---|---|---|---|
| 1 | Business on Line (BOL) | 100% credit upon booking | Bonus will be paid on the 1st year BOL hosting fee. |
| 2 | Education Booked | 100% credit upon booking | Education booked includes:<br>a) Tutor and iLearning<br>b) Prepaid Instructor Led Training (ILT) Units<br>c) Education Training Units<br>d) CBT/TBT Product Sales<br>e) CBT/TBT Web Subscriptions<br>f) Net Class Subscriptions<br>g) Pre-paid Integrated Teaching Offerings<br>h) Pre-paid Complete Course Offerings<br>i) Other Pre-paid Education Offering<br><br>For field sales, Tutor and iLearning products booked will be credited under license and paid as commission. For customers who have purchased pre-paid Education Training Units and drawdown against the prepaid training unit accounts to purchase Tutor or iLearning products, the corresponding credit to License will be debited from the Education bonus previously paid to the employee for the amount of Tutor or iLearning product purchased. |

### B. Special Bonuses/Incentives

Special bonuses/incentives may be declared from time to time for specific products and/or services and for a specific period only in which case the applicable rules will be published

FY01 Sales Compensation Terms & Conditions – North America

separately at that time. To qualify for such special bonuses/incentives the employee must be employed on the last day of the applicable quarter.

## C. Sales Consulting Bonus

Bonus pool contribution is based on the performance of the applicable group/region/country as shown in Appendix 5. Disbursement of the bonus may be based on revenue contribution, responsiveness to support of customers or other management assessment. The quota is evenly divided into quarters and bonus is year-to-date prorated and adjusted for prior quarters' payments.

## Appendix 3: Quota Credits & Bonuses – Support Sales

### I. Quota Credits

Where the individual compensation plan shows Quotas under the following headings, credits will apply as below:

### A. Premium Support

New Premium Support Offerings will be rolled out under the E-Business Support Model, Phase II (date yet to be announced).  Until then, commissions will be paid on the following:

- OracleExpertise (ExpertPackages, ExpertOnsite, ExpertOnline and ExpertSatellite).

- Oracle Lifecycle

- Oracle*Gold* (the incremental component above the underlying Product Support and Updates Subscription portion only)

- Oracle Contact

All contracts will count against Quota, whether they are a first year or a subsequent year contract.

For multi-year deals, Quota credit on initial booking is allocated for the first twelve months' booking only.  Quota credit for any future years will be allocated on each anniversary date for the subsequent twelve month period to the Support Sales Representative responsible for the account at that time.

100% Quota credit will be given upon booking, provided the support contract commencement date and invoice date are within 90 days of the transaction book date and the start date is no later than May 31, 2001.  Bookings are defined in Appendix 1.

The Company reserves the right to introduce new services and withdraw existing services from the Premium Services range.   Any new Premium services introduced will be communicated separately.

For Premium Support (first year or renewal), 100% of the revenue is credited to the country performing the services.  Quota credit will be allocated in the same manner to the country or countries, where known, in the same proportion as the revenue credit.  Where the apportioning of the revenue is not known, the respective Country Support Managers/Directors will agree an estimated and reasonable apportioning of the bookings for compensation purposes.

### II. Bonus Credits

The following Bonus credits apply to Support Sales:

### A. Support Renewals Bookings

Support Renewals Bookings includes Updates Subscription Services, Product Support, and Incident Support.  100% Quota credit will be given upon booking.

Support renewals bookings are defined as the total amount of revenue to be recognized by the Company for the term of the renewed support contract up to a maximum of 12 months, unless support contracts are being co-terminated.  Co-terminated support is the adjustment of the support contract length such that varying support contract end dates from various license sales are varied to provide one common support contract end date to customers.

FY01 Sales Compensation Terms & Conditions – North America

Under the new E-Business Support Model, Phase II (date yet to be announced), adjustments to targets may be made under certain circumstances, including but not limited to:

- the customer renews Support contracts at a lower level than that of the previous contracts
- the customer opts for Updates Subscription Services only
- co-termination of Support contracts results in the need to renew contracts more than once in the Fiscal Year
- all existing renewals that are still under the old pricing model will count against the bonus target and will be compensated accordingly
- where a customer requires premium support services and renewals to be included in the same invoice, the elements will be separated out according to Corporate standards and compensated accordingly
- where a lapsed support contract is re-instated, the re-instated contract will count against the renewals target and compensated accordingly
- where a support renewal is included in a first year contract, the renewal element will count against the renewals target and will be compensated accordingly, assuming it is renewed at the same value as the previous year

To qualify for bonus payments within FY01, support renewals bookings must have a support contract commencement date within 90 days of the transaction book date, but in any event, no later than May 31st 2001.

FY01 Sales Compensation Terms & Conditions – North America

## Appendix 4: Quota Credits & Bonuses – Education Sales

### I. Quota Credits

Where the individual compensation plan shows Quotas under the following headings, credits will apply as follows:

**1  Education Bookings**

| | |
|---|---|
| • Education Training Units | 100% credit upon booking |
| • Technology Based Training Products (TBT) Perpetual and Subscription Licenses | 100% credit upon booking |
| • Tutor Product Licenses and 1st year Support | 100% credit upon booking (200% in EMEA and AP with quota uplift) |
| • Performance Consulting engagements funded through Project Accounting or equivalent | 100% credit upon booking |
| • i Learning Product License subscriptions and 1st year Support | 100% credit upon booking |
| • Net Class offerings and subscriptions | 100% credit upon booking |
| • Integrated teaching offerings (Etracks) | 100% credit upon booking |
| • Other prepaid Education offerings | 100% credit upon booking |
| • Non-prepaid Purchase Orders and Volume Purchase Agreements (VPA's) | 50% credit upon revenue recognition (Latin, EMEA and Asia only) |

**2  Education Revenue**

| | |
|---|---|
| • Instructor Led Training (ILT) revenue | 100% credit upon revenue recognition |
| • TBT Product License revenue | 100% credit upon revenue recognition |
| • Complete Course offerings (ILT + TBT) | 100% credit upon revenue recognition |

### A. Education Bookings

Education bookings credit is allocated to eligible Education sales employees based upon their sale of the products and services outlined above under "Education Bookings". If contract actions occur to cancel or remove bookings, the corresponding bookings Quota credit and commissions to the Education sales employee will be reversed.

### A1. Education Training Units

If products or services other than ILT are drawn down from a Training Unit contract within 180 days of inception, the Quota credit and corresponding commissions previously credited to the Education salesperson will be reversed, and the applicable amount of Quota credit and commissions will be credited under the new, appropriate Education Bookings category. For example, if a Field Education Sales Representative receives $50,000 Quota credit upon booking a $50,000 Prepaid Training Unit Contract, and $5,000 in TBT product is subsequently drawn down from that contract, $5,000 of the Prepaid Training Unit Quota credit will be reversed, and $5,000 TBT credit will be given upon revenue recognition of the TBT order. If the $5,000 TBT draw down occurs after 180 days, then there would be no reversal of the original quota credit and full credit would be given on the TBT draw down.

For FESR's, only Training unit contracts in excess of the local minimum level will qualify for bookings credit. The minimum level applicable is shown under "Minimum Bookings Values" in Section II below.

FY01 Sales Compensation Terms & Conditions – North America

## A2. TBT Perpetual License

For FESR's and TESR's, only Technology Based Training (TBT) perpetual license orders over the local minimum level qualify for bookings credit. For ETR's, only Technology Based Training (TBT) perpetual license orders under the local minimum level qualify for bookings credit. The minimum level is shown under "Minimum Bookings Values" in Section II below.

## A3. TBT Subscription License

For FESR's and TESR's, only Technology Based Training (TBT) subscription license orders over the local minimum level qualify for bookings credit. For ETR's, only Technology Based Training (TBT) subscription license orders under the local minimum level qualify for bookings credit. The minimum level is shown under "Minimum Bookings Values" in Section II below. The booking value is calculated by multiplying the annual subscription value by the number of years of the subscription.

## A4. Tutor and iLearning – First Year Support

A salesperson may receive credit for the total amount of revenue to be recognized in the Company's accounting records for first year support on Tutor and iLearning Product Licenses. This credit rule applies only when the first year support is sold, a purchase order is obtained and the order is booked all within 30 days of the sale of the corresponding new license.

When customers with existing licenses and support purchase new licenses, the new license purchases are handled as separate transactions and the corresponding support is considered First Year. Support on existing licenses is not considered First Year Support.

## B. Education Revenue

Education revenue credit is allocated to eligible Education sales employees based upon their sale of the products and services outlined above under "Education Revenue". Education revenue Quota credit will equal the net revenue recognized by the Company. If actions occur that reverse the revenue, the corresponding revenue quota credit and commissions to the Education Sales employee will be reversed.

## II.  Country/Divisional Variations

## A.  Minimum Bookings Values

The minimum bookings values mentioned in Section I, will be as follows:

| Country/Division Minimum Bookings Value | United States Minimum | Canada Minimum | EMEA, Asia Pacific, Japan, Latin America Minimum |
|---|---|---|---|
| Training Units - FESR only | $100,000 | $22,500 CDN | $30,000 |
| TBT Perpetual Licenses FESR/TESR | $10,000 | $5,000 CDN | $5,000 |
| TBT Perpetual Licenses ETR | $0 - $9,999 | $0 - $4,999 CDN | $0 - $4,999 |
| TBT Subscription Licenses FESR/TESR | $10,000 | $5,000 CDN | $5,000 |
| TBT Subscription Licenses ETR | $0 - $9,999 | $0 - $4,999 CDN | $0 - $4,999 |

## B.  Tutor and iLearning License and 1st year Support Credit

FY01 Sales Compensation Terms & Conditions – North America

Quota credit for Americas and Japan sales of Tutor and iLearning Licenses and 1st year Support will be 100% upon booking. Quota credit for EMEA and Asia Pacific Sales of Tutor and iLearning Licenses and 1st year Support will be 200% upon booking, provided the quota for these items is set at 200% of target.

## C. Non Pre-Paid Purchase Orders and Volume Purchase Agreements

50% bookings credit will be given for non-prepaid purchase orders, guaranteed volume purchase agreements and standing discount agreements. This credit will be given upon actual recognition of the applicable revenues in Latin America, EMEA and Asia only.

FY01 Sales Compensation Terms & Conditions – North America

**Appendix 5: Country Variations**

**Country: USA**

Throughout the Terms and Conditions or in the Plan, reference is made to local schedules and values. For the above country, these shall have the following values or meaning:

| Reference | Item | To be completed by the country |
|---|---|---|
| Individual Compensation Plan | Currency used for salary and OTE | USD |
| Individual Compensation Plan | Currency used for targets | USD |
| Individual Compensation Plan | Effective date of salary | For Plans starting on 1st June 2000, the effective date of the salary shown is 1st June 2000. For new hires or transfers from a different compensation arrangement the effective date of the salary will be the hire or transfer date. |
| T&C's Section I | Local language information on Business Practices, etc | http://splan.us.oracle.com/ |
| T&C's Section IIC | Local commission and Bonus payment schedule | Commissions and Bonuses are paid monthly in arrears. |
| T&C's Section IIIA | Commission payments | Commission is calculated on year-to-date Quota credit versus cumulative quarterly Quota starting with the lowest tier. Each tier must be completed before progressing to the next tier for that quarter, except that an employee may only progress to the highest tier once he/she achieves 100% of the annual Quota. Quota performance attainment will be recalculated each month against the new cumulative quarterly year-to-date target. At year end, the final commission will be calculated based on performance against annual quota and any commission already paid in excess of that earned will be treated as an advance against future commission payments.    Except as set forth in the Administration and Approvals section II above, Quota credit on a sale is credited to a tier in the month the Company recognizes the license revenue or books the first year support.<br><br>On termination of employment, employees paid commission on a cumulative quarterly Quota basis as described above will have their final commission calculated against their annual target and any commission already paid in excess of that earned will be deducted from final salary, commission and/or bonus in accordance with paragraph VIIIC.    Final |

FY01 Sales Compensation Terms & Conditions – North America

| | | |
|---|---|---|
| | | commission will only be paid at the highest commission tier provided the annual Quota has been achieved. |
| T&C's Section IIIB | Clawback | The local limit for days past due is 90 days. |
| T&C's Section IIIB | Clawback | Clawback will be at original rates. |
| T&C's Appendix 1, Section N | Car Allowance/OTE | Car allowance is included in the definition of OTE. |
| T&C's Appendix 2, Section IA | Field Sales minimum commissionable order value | $5,000 USD list price for direct orders, and $5,000 USD net price for indirect orders. |
| T&C's Appendix 2, Section I2 & IA | iSD minimum commissionable order value | $5,000 USD list price for direct orders, and $5,000 USD net price for indirect orders. |
| T&C's Appendix 2, Section IC | Partner sell through revenue | Partner sell through revenue includes sublicenses revenue on sales greater than $5,000 commercial list price. |
| T&C's Appendix 2, Section !E | iSD Increments | The iSD increments are as follows: Increment 1: 100,000 USD Increment 2: 100,000 - 150,000 USD Increment 3: 150,000 - 300,000 USD Increment 4: 300,000 – 1m USD Increment 5: over 1,000,000 USD The above amounts are list price. |
| T&C's Appendix 2, Section IIC (Field Licenses) | Sales Consulting Bonus pool | The Sales Consulting Bonus pool will be based on total business unit Licenses. |

## Appendix 5: Country Variations

## Country: CANADA

Throughout the Terms and Conditions or in the Plan, reference is made to local schedules and values. For the above country, these shall have the following values or meaning:

| Reference | Item | To be completed by the country |
|---|---|---|
| Individual Compensation Plan | Currency used for salary and OTE | Canadian dollar CDN |
| Individual Compensation Plan | Currency used for targets | USD for iSD salespeople and Sales Consultants who support US customers.<br><br>**OR**<br><br>Canadian dollar (CDN) for all others. |
| Individual Compensation Plan | Effective date of salary | For Plans starting on 1st June 2000, the effective date of the salary shown is *1st June 2000. For new hires or transfers from a different compensation arrangement the effective date of the salary will be the hire or transfer date. |
| T&C's Section I | Local language information on Business Practices, etc | http://candora.ca.oracle.com/ |
| T&C's Section IIC | Local commission and Bonus payment schedule | Commissions are paid monthly in arrears. Bonuses are paid quarterly or monthly (depending upon the type of bonus), in arrears. |
| T&C's Section IIIA | Commission payments | If the employee signs and returns the Attachment to FY01 Compensation Plan - FY01 Advances Terms and Conditions document, Commission is calculated on year-to-date Quota credit versus cumulative quarterly Quota starting with the lowest tier. Each tier must be completed before progressing to the next tier for that quarter, except that an employee may only progress to the highest tier once he/she achieves 100% of the annual Quota. Quota performance attainment will be recalculated each month against the new cumulative quarterly year-to-date target. At year end, the final commission will be calculated based on performance against annual quota and any commission already paid in excess of that earned will be treated as an advance against future commission payments. Except as set forth in the Administration and Approvals section IIB above, Quota credit on a sale is credited to a tier in the month the Company recognizes the license revenue or books the first year support.<br><br>On termination of employment, employees paid commission on a quarterly year to date |

FY01 Sales Compensation Terms & Conditions – North America

| | | |
|---|---|---|
| | | basis as described above will have their final quarter's commission calculated against their annual target and any commission already paid in excess of that earned will be deducted from final salary, commission and/or bonus in accordance with paragraph VIIIC. Final commission will only be paid at the highest commission tier provided the annual Quota has been achieved.<br><br>**OR**<br><br>If the employee declines to sign and return the Attachment to FY01 Compensation Plan – FY01 Advances Terms and Conditions document, Commissions are calculated on year-to-date Quota credit versus the annual Quota set out in the individual Plan starting with the lowest tier. Each tier must be completed before progressing to the next tier. An employee may only progress to the highest tier once he/she achieves 100% of the FY01 Quota. Except as set forth in the Administration and Approvals section IIB above, Quota credit on a sale is credited to a tier in the month the Company recognizes the license revenue or books the first year support. |
| T&C's Section IIIB | Clawback | The local limit for days past due is 90 days. |
| T&C's Section IIIB | Clawback | Clawback will be at original rates. |
| T&C's Appendix 1, N | Car Allowance/OTE | Car allowance is included in the definition of OTE. |
| T&C's Appendix 2, IA | Field minimum commissionable order value | $0 CDN |
| T&C's Appendix 2, Section I2 & IA | iSD Sales minimum commissionable order value | $7,500 CDN for iSD salespeople supporting Canadian customers.<br><br>**OR**<br><br>$6,000 USD for iSD salespeople supporting US customers. |
| T&C's Appendix 2, IC | Partner sell through revenue | Partner sell through revenue includes sublicenses revenue on sales greater than $0 commercial list price. |
| T&C's Appendix 2, IE | iSD Increments | The iSD increments for salespeople supporting Canadian customers are as follows:<br>Increment 1: $100,000 CDN<br>Increment 2: $100,000 - $150,000 CDN<br>Increment 3: $150,000 - $300,000 CDN<br>Increment 4: $300,000 - $1,000,000 CDN<br>Increment 5: over $1,000,000 CDN<br><br>**OR** |

FY01 Sales Compensation Terms & Conditions – North America

| | | | |
|---|---|---|---|
| | | | The iSD increments for salespeople supporting US customers are as follows:<br>Increment 1: $100,000 USD<br>Increment 2: $100,000 - $150,000 USD<br>Increment 3: $150,000 - $300,000 USD<br>Increment 4: $300,000 - $1,000,000 USD<br>Increment 5: over $1,000,000 USD<br><br>The above amounts are list price. |
| T&C's Appendix 2IH | Revenue Sharing | | The table shown in Appendix 2IH will apply to revenue sharing between Canadian territories and those of other countries internationally.<br><br>Revenue sharing for sales within Canada will be split as follows.  Credit for accounts approved as National accounts will be 100% to the signing location.  Credit for Major accounts will be 50% to the signing location and 50% to the UPU/user location.  Credit for Named Branch/Province/Region accounts will be 100% to the signing location if the UPU/users are within the Branch/Province/Region respectively.  All other out of territory sales will be credited 100% to the UPU/user location. |
| | | | Nomination of an account as a National, Major or Named Branch/Province/Region account must be approved by the President, Oracle Canada, and will become effective in the quarter following approval. |
| T&C's Appendix 2, Section IIC (Field Licenses) | Sales Consulting Bonus pool | | The Sales Consulting Bonus pool will be based on total group, region and/or country License and 1st Year Support as shown in the Individual Plan. |

## Appendix 6: Translation of Key Words

The following terminology that appears in English on individual Plans is translated as follows:

| English | Local Language |
|---|---|
| Name | NA |
| Title | NA |
| Employee ID | NA |
| On-Quota Date | NA |
| License and First Year Support Quota | NA |
| Runrate Licence and 1st Year Support Quota | NA |
| Quota Commission Rates | NA |
| Sales Target | NA |
| Sales Target Bonus Rates | NA |
| Business Initiatives Points Target | NA |
| | |
| Initiatives Point Bonus Rates | NA |
| Quota Club Qualification | NA |
| 100% Attainment of Club Quota | NA |
| **Telesales**<br>The number of Telesales reps qualifying will be limited to the number of prime sales personnel qualifying from the country. | NA |
| **Solutions Specialists**<br>The number of qualifiers will be limited to three quarters of the sales target percentage attainment multiplied by the number of eligible Solutions Specialists. | NA |
| **Sales Consultants**<br>The number of qualifiers will be limited to one half of the sales target attainment percentage multiplied by the number of eligible Sales Consultants, not to exceed the number of qualifying prime sales people . | NA |
| **Business Development**<br>Club Qualification is discretionary and must be approved by an Executive Vice President. | NA |
| % Attainment | NA |
| Salary | NA |

source

FY01 Sales Compensation Terms & Conditions – North America

| | |
|---|---|
| Commission | NA |
| Total Compensation | NA |
| % of OTE | NA |
| In addition to the above compensation you may be eligible to receive bonuses for specific products and services. Please refer to the Terms and Conditions for a complete listing of bonuses available under this plan. | NA |
| I acknowledge receipt and accept this document accompanied by the Terms and Conditions as my FY01 compensation package. | NA |

FY01 Sales Compensation Terms & Conditions – North America

## Appendix 7: Business Initiatives Template

The goals/initiatives should be SMART i.e. Specific, Measurable, Ambitious, Realistic and Timebound. They should reflect the strategic objectives, operating plans and goals beginning of the year for the whole year, or they may be set semi-annually or quarterly.

**Employee Name:**                                          **Employee #:**
**Employee Title:**                                          **Location/Department:**
**Employee Manager:**                                      **Period Covered:**

| | Individual Goals/Initiatives | Measurement of Success | Points at 100% Achievement | Achievement Date | Resul Ac |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| | **Total Annual Points** | | **100** | | |

At time of objective setting
**Employee Signature:**                    **Manager Approval:**              **2nd Level Manager Approval:**
**Date:**                                        **Date:**                                **Date:**

At time of rating
**Employee Signature:**                    **Manager Approval:**              **2nd Level Manager Approval:**
**Date:**                                        **Date:**                                **Date**

Oracle Proprietary & Confidential
Version 1.2                                                                                  25

**Accelerators:** Commission rates paid to a salesperson for quota performance above 100%.

**Bonus:** A quarterly payment made to a salesperson based on achievement of documented quarterly objectives.

**Commercial List Price:** The published price of a product or service prior to any discount.

**Commission:** A monthly payment made to a salesperson as he/she sells against a quota.

**Journal Entry:** Transfer of revenue between different cost centers.

**Leverage:** The percentage of target compensation paid out at each level of quota performance.

**Mix:** The ratio of fixed to variable earnings in a compensation plan.

**Non-recoverable Draw:** A guaranteed payment made to a salesrep in lieu of a compensation plan

**Non-revenue Credit:** Credit that is given to a salesperson when the revenue from the deal is booked to a cost center other than that salesperson's cost center.

**On-Quota Date:** The effective date that a salesperson may begin receiving quota credit and payment against the compensation plan.

**Quota Club:** Annual sales award to recognize quota achievement for the top Oracle sales personnel.

**Quota Credit:** Credit that is given to one or more salespeople against quotas for a transaction.

**Rate Factors:** Multipliers applied to base commission rates in order ot determine commission payment for certain products and services.

**Recoverable Draw:** An advance against variable compensation which is recovered as commissions and bonuses are earned.

**Revenue Credit:** Credit that is given to a salesperson and cost center for the purposes of recording a transaction on Oracle's Books.

**Sales Credit:** Credit which is paid at a flat rate and is given to one or more salespeople against a set target.

**Target Compensation:** Total annual remuneration at 100% performance of a Compensation Plan.

**Terms and Conditions:** Legal documents which accompany the Compensation Plan and set forth the rules for payment and how the Plan is administered.

**Variable Compensation:** Employee remuneration that is dependent upon performance against a quota or other objectives as stated in a Compensation Plan.

Clawback
Credit Memo
Giveback

# EXHIBIT

# C

The disputed statute in *Lynce* retroactively cancelled all provisional credits awarded to inmates, thereby lengthening the inmates' sentences and even resulting in the rearrest of some inmates who had been released. *Lynce*, 117 S.Ct. 891. In the case at bar, the revised policy does not deny credits already earned or awarded nor prohibit a prisoner from obtaining the maximum amount of credits available. Instead, the policy only requires that inmates find new ways of earning the 12.5 days per month credit allowed.

### ORDER

For the foregoing reasons, it is ORDERED that defendant's motion for summary judgment be ALLOWED on plaintiff's ex post facto claim.

[1] Defendants are James DiPaola, Sheriff of Middlesex County, and Paul Norton, Superintendent of the Middlesex County House of Correction.

[2] The equal protection issue is still pending and is not addressed by this Order.

[3] A separate question exists as to whether the May 1995 revised policy violates the consent decree filed in response to *Doyle v. McGonigle*, Civil No. 89-1519 (Middlesex Super. Ct. 1989); however, this is not alleged by defendant and, thus, is not addressed by this Court.

[4] Prisoners can earn good time credits in three categories: work, education and treatment. Under the old policy, an inmate could "max-out" using only two categories since he could earn up to 7.5 days credit in each. The May 1995 revised policy requires an inmate to participate in programs in all three categories to be eligible to "max-out" since he only could earn 5 days credit in each.

[5] The old "gain time" statute granted inmates with certain deductions as follows: 5 days per month off the first and second years of an inmate's sentence, 10 days per month off the third and forth years, and 15 days per month for the fifth and all succeeding years. The new statute reduced those amounts to 3 days per month, 6 days per month, and 9 days per month, respectively.

---

**Russell J. Doherty v. American Medical Response of Massachusetts, Inc. et al.**[1]

Superior Court, Middlesex, SS

No. 9702737J

Memorandum Dated November 12, 1997

---

**Master and Servant – Wages – Action to Recover – Statutes Authorizing Treble Damages Do Not Apply to Unearned Wages to Which a Terminated Employee Might be Entitled as Damages for Breach of an Employment Contract.** The statutes authorizing treble damages if an employer does not pay all earned wages on the day an employee is discharged, M.G.L.c. 194, §148 and M.G.L.c. 194, §150, do not apply to additional wages that might be recovered as damages for breach of an employment contract.

**Master and Servant – Wages – Action to Recover – Statutes Authorizing Treble Damages Do Not Apply to Irregularly Paid Sales Commissions.** The statutes authorizing treble damages if an employer does not pay all earned wages on the day an employee is discharged, M.G.L.c. 194, §148 and M.G.L.c. 194, §150, apply to sales commissions only with respect to commissions regularly earned and paid as part of the employee's weekly wages, such as commissions to a retail sales clerk. The statute does not apply to commissions on irregular sales that generally are not earned each pay period. This opinion holds that commissions on the irregular sale of emergency vehicles are not covered by the Act.

---

BOTSFORD, J.

### INTRODUCTION

This case has a history. The plaintiff, Russell J. Doherty, ("Doherty"), alleges that on May 5, 1994, he and Michael Chaulk of Chaulk Services Inc. ("Chaulk") signed a two-year agreement regarding Doherty's employment with that company. On November 29, 1994 Doherty filed a breach of contract action (referred to hereafter as the 1994 action) against Chaulk, challenging his termination because he was terminated by Chaulk on July 7, 1994, before the end of the contract.[2] On March 21, 1997, Doherty moved to amend the complaint in the 1994 action to add a count under G.L.c. 149, §§148 and 150. On April 23, 1997, a judge of this Court (Houston, J.) denied the motion. Following the denial, Doherty brought the present action, again raising a claim under G.L.c. 149, §§148, 150. The defendants have moved to dismiss. As grounds for their motion, the defendants, Chaulk and American Medical Response of Massachusetts (collectively referred to hereafter as AMRM), argue that the complaint fails to state a claim under which relief can be granted because G.L.c. 149, §§148 and 150 do not apply to Doherty in the circumstances of this case. AMRM also claims that under Mass.R.Civ.P. 12(b)(9), the pendency of the 1994 action bars the present complaint. For the reasons stated below, the defendants' motion is allowed.

### DISCUSSION

1. AMRM first asks the court to dismiss this action pursuant to Mass.R.Civ.P. 12(b)(6). When evaluating the sufficiency of a complaint pursuant to Mass.R.Civ.P. 12(b)(6), the court must accept as true the well pleaded factual allegations of the complaint, as well as any inference which can be drawn therefrom in the plaintiff's favor. *Fairneny v. Savogran Co.*, 422 Mass. 469, 470 (1996); *Eyal v. Helen Broadcasting Corp.*, 411 Mass. 426, 429 (1991), and cases cited. "[The] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Nader v. Citron*, 372 Mass. 96, 98 (1977), quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). All inferences should be drawn in the plaintiff's favor in the complaint "so as to do sub-

Case 1:02-cv-11773-NG   Document 4   Filed 09/12/02   Page 41 of 56

726                                                *The Massachusetts Law Reporter*
Cite as 7 Mass. L. Rptr. No. 31, 726 (February 23, 1998)

stantial justice." *Ourfalian v. Aro Mfg. Co, Inc.*, 31 Mass.App.Ct. 294, 296 (1991).

Doherty alleges the following facts which I accept as true for the purposes of this motion. The compensation Doherty received under his contract with AMRM included a weekly salary and commissions from the emergency vehicles he sold. The high commission rate set forth in the employment contract was to offset his low salary and compensate him closer to the industry's standards. However, due to the unpredictable nature of AMRM's business, Doherty's commission was not determined and paid on a regular schedule. Since Doherty's termination, AMRM has paid Doherty all of the salary he had earned up to the date of his termination. AMRM has not, however, paid Doherty any commission for sales he may have completed before the date of his termination. Doherty alleges AMRM's refusal to pay his prospective salary and commission was willful and in bad faith.

General Laws c. 149, §148 (§148),[3] on which Doherty rests his claim, protects workers by mandating employers to pay employees the wages they earned on a weekly, bi-weekly or other regular basis. "Doubtless the legislation . . . was enacted primarily to prevent unreasonable detention of wages." *American Mut. Liab. Ins. Co. v. Commissioner of Labor & Indus.*, 340 Mass. 144, 147 (1959). General Laws c. 149, §150, the other statute relied on by Doherty, permits the court to award treble damages and attorneys fees to successful plaintiffs with claims under §148.

In this case, Doherty has not alleged facts, that if true, would show that AMRM has violated §148 with regard to either his wages or the commissions. The statute provides that "any employee discharged . . . shall be paid in full on the day of his discharge." Doherty was discharged on July 7, 1994, and apparently has been paid the portion of his salary which he had earned up to that date. Although Doherty alleges that he signed a two-year employment contract, §148 does not mandate that employers must pay to employees discharged before the end of a contract term the amount in salary which the employee could have earned in the future, but for the discharge. (I note that in the pending 1994 action Doherty claims he is entitled to the lost future salary as part of his damages.)

Section 148 also orders "the payment of commissions, when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable . . ." Doherty cannot rely on this statute to collect commissions from sales he made while employed by AMRM. In *Commonwealth v. Savage*, 31 Mass.App.Ct. 714, 176 (1991), the court interpreted §148 regarding the recovery of commissions. The court noted that the statute "assist[s] employees who would be paid on a weekly basis, such as retail salespeople, and for whom

commission constitutes a significant part of weekly income." This interpretation of the statute refers to the recovery of a weekly, determinable commission, not the type of commission Doherty attempts to be awarded here.

According to the complaint, Doherty had a salary of $45,000 plus commissions. Doherty's commissions were not paid on a regular basis because of the unpredictable nature of AMRM's business of selling emergency vehicles. The contract specified a method to determine the amount of Doherty's commissions, but did not specify a date of commission determination or payment. The commissions Doherty may have earned were neither "definitely determined" nor "due" on the date he was terminated from his position at AMRM, or on any other specific date. As with the salary that Doherty claims AMRM has wrongfully withheld, the commissions Doherty may be owed are part of his claim in the breach of contract action.

2. AMRM also moves the court to dismiss this case under Mass.R.Civ.P. 12(b)(9), due to the pendency of the 1994 action. I do not base the dismissal on this ground, as Doherty was not permitted to amend his complaint in the 1994 action. Rather, the case is dismissed under Rule 12(b)(6) because G.L.c. 149, §§148 and 150 are inapplicable, and thus Doherty has failed to state a claim on which relief may be granted.

ORDER

For the foregoing reasons, it is ORDERED that the defendant's motion to dismiss the claim be ALLOWED.

──────────

[1]Chaulk Services, Inc. The defendant, American Medical Response of Massachusetts, Inc. is the corporate successor to Chaulk Services, Inc.

[2]The 1994 action is pending in the Middlesex County Superior Court and captioned *Russell J. Doherty v. Chaulk Services, Inc.*, C.A. No. 94-6895.

[3]General Laws c. 149, §148 provides in relevant part as follows:

Every person having employees in his service shall pay weekly or biweekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week . . . ; and any employee discharged from such employment shall be paid in full on the day of his discharge . . .

. . .

This section shall apply, so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee and commissions so determined and due such employees shall be subject to the provisions of section one hundred and fifty . . .

# EXHIBIT

# D

**Commonwealth of Massachusetts**
**County of Norfolk**
**The Superior Court**

*12-185-02*

Civil Docket NO.CV2001-01825

RE:    Okerman v VA Software corporation, f/k/a et al

TO:    Robin B Lesses, Esquire
       Pepe & Hazard
       150 Federal Street
       28th Floor
       Boston, MA 02110


RECEIVED
JUN 2 8 2002
By____

## CLERK'S NOTICE

This is to notify you that in the above referenced case the Court's action on **06/27/2002**:

*RE: Defendant Larry M Augustin's MOTION to Dismiss Count VI*
*Pursuant To Mass.R.Civ.P.12(b)(6)*

**is as follows:**

**Motion to Dismiss (P#10.0) ALLOWED as to Count VI of Complaint: see Memorandum And Order (Jeffrey A. Locke, Justice) dated 6/26/02 Notices mailed June 27, 2002**

Dated at Dedham, Massachusetts this 27th day of June, 2002.

Walter F. Timilty,
Clerk of the Courts

BY:

Assistant Clerk

Telephone: (781) 326-1600

Copies mailed 06/27/2002

dated
6/25/02   RECEIVED & FILED   6/27/02
CLERK OF THE COURTS
NORFOLK COUNTY

15,0

## Memorandum and Order

June 25, 2002:   After hearing and upon review and consideration of the pleadings, Defendant Augustin's Motion to Dismiss Count VI (violation of M.g.L. c. 149, s. 148 ["Wage Act"]) is **ALLOWED**.  The Court finds that the plaintiff's right to commissions were contingent upon the attainment of certain sales goals being reached and therefore are not "definitely determined" under the Wage Act.  The Court declines to adopt plaintiff's invitation to expansively construe the scope of c. 149 to cover commissions of the sort alleged in the complaint.  To the contrary, a growing body of caselaw in Massachusetts has consistently limited the scope of the Wage Act.  See, e.g. Cumpata v. Blue Cross Blue Shield of Massachusetts, Inc., 113 F.Supp.2d 164, 167 (D.Mass. 2000); Doherty v. American Medical Response of Massachusetts, 1997 Mass. Super. LEXIS 79; Huebsch v. Katahdin Industries, Inc., 2001 WL 716884 (Mass. Super. Ct., April 24, 2001J.); Locke v. Sales Consultants of Boston, Inc., 2001 WL 716911 (Mass. Super. Ct., April 13, 2001)(Hinkle, J.).  Moreover, the Wage Act was intended to protect wage earners who relied on the payment of their weekly or bi-weekly salary and, in the case of retail sails employees, the payment of a regular commission, rather than on employees who had opportunities for commissions in addition to a healthy salary.  Here there is no claim that the defendants ever withheld any part of the plaintiff's $90,000 annual salary.

Accordingly, the motion to dismiss Count VI is **ALLOWED.**

Justice of the Superior Court

A TRUE COPY

Attest: Manya Jackson   6/27/02
Deputy Assistant Clerk

# EXHIBIT

# E

authority to enter "the commercial premises" during "regular business hours" to "inspect . . . records and inventory for the purpose of enforcing the provisions of this section." G.L.c. 140, §123.

Sullivan's business is located in his home garage. Even though the garage has a separate entrance accessible from the outside, it is attached to Sullivan's house and shares the same residential address. Although the legislature did not define the term "dwelling" or "residence," when a statute is silent as to the definition of certain terms, the legislature is "presumed to have intended to incorporate the common law definition . . . 'at least in so far as it is not inconsistent with the terms or the purpose of the statute.' " *Commonwealth v. Ricardo*, 26 Mass.App.Ct. 345, 356 (1988) (citing *Commonwealth v. Burke*, 390 Mass. 480, 484-85 (1983)). The common law definition of a dwelling is "the house or other structure in which a person or persons live; a residence, . . . the apartment or building, or group of buildings, occupied by a family as a place of residence." Black's Law Dictionary 505 (rev. 6th ed. 1990).

Read as a whole, G.L.c. 140 clearly reflects the legislature's intent that firearm businesses be conducted in commercial settings and not in private residences. The fact that a portion of a private residence has been earmarked by its owners as "separate" and "solely for business purposes" does not satisfy the requirements of the statute. The legislature established as the First condition of obtaining a license "[t]hat the provisions in regard to the nature of the license and the building in which the business may be carried on under it shall be *strictly* adhered to." G.L.c. 140, §123 (emphasis added).

Further evidence of the legislature's intent to remove firearm dealerships from residences can be found in the effective date of G.L.c. 140, §123, condition Fifteenth. While the other provisions of the Massachusetts Gun Control Act of 1998 took effect on October 21, 1998, the effective date of G.L.c. 140, §123, condition Fifteenth, as applied to current license holders, was delayed until September 1, 1999. See St. 1998, c. 180, §78. The apparent purpose of the delay was to give current licensees who conducted business out of their residences an opportunity to move their businesses to a strictly commercial setting as required by the statute.

The decision of the Massachusetts State Police, Division of Administrative Services is in accordance with the applicable law and is supported by substantial evidence. *Lapointe v. Licensing Bd. of Worcester*, 389 Mass. 454, 462 (1983).

### ORDER

For the foregoing reasons, it is therefore *ORDERED* that plaintiff's motion for judgment on the pleadings is denied and defendants' motions for judgment on the pleadings are allowed. Judgment shall enter *AFFIRMING* the decision of the Massachusetts State Police, Division of Administrative Services, denying renewal of plaintiff's firearms dealer's license.

[1] Gregory Wright, Chief of the Pembroke Police Department.

[2] In *Sullivan v. Reilly*, Suffolk Sup.Ct. Civ. Action No. 2000-0446H, Sullivan and other firearms dealers sought declaratory and injunctive relief asserting that the home sales prohibition deprived them of equal protection and due process rights and that G.L.c. 140, §123, as amended, was unconstitutionally vague. In a decision dated May 24, 2000 [12 Mass. L. Rptr. 184], this Court (Lopez, J.) rejected the dealers' constitutional challenges to the validity of the home sales prohibition, but ruled that license holders were entitled to notice and a hearing before their licenses were taken for failure to comply with the statute. The sole issue before this Court is the validity of the decision of the Massachusetts State Police affirming the Pembroke Police Chief's decision not to renew Sullivan's license under G.L.c. 30A, §14.

[3] On October 29, 1999, the Attorney General for the Commonwealth of Massachusetts sent a letter to all Massachusetts police chiefs requesting that they review outstanding firearms dealer licenses issued by their departments to ensure that the licenses were in compliance with the home sales provision of the Massachusetts Gun Control Act of 1998. In this letter, the Attorney General explained that G.L.c. 140, §123, condition Fifteenth expressly requires firearms dealers to maintain a place of business that is neither a dwelling nor a residence. Plaintiff places great emphasis on this letter challenging, *inter alia*, the Attorney General's authority to send such advisory letters to local police chiefs. Suffice it to say that the letter is wholly irrelevant to the issue presented by this appeal.

---

### Susan F. Huebsch, as Executrix of the Estate of Roger M. Huebsch v. Katahdin Industries, Inc.

Superior Court, Middlesex, SS
No. CA004483
Memorandum Dated April 24, 2001

**Master and Servant – Wage and Hour Laws – Nonpayment of Wage Act – Act Applies Only to Compensation for Past Services and Therefore Not to a Claim for Future Compensation Payable Pursuant to a Breached Employment Contract.** The Nonpayment of Wage Act, with its authorization for treble damages and attorneys fees, M.G.L.c. 149, §148, applies only to compensation for past services and therefore does not apply to claims under an employment contract with a former key employee for (a) compensation for future services, or (b) continued salary payments to the employee's estate if the employee dies before the contract expires.

**Master and Servant – Wage and Hour Laws – Nonpayment of Wage Act – Act Applies Only to Noncontingent Compensation and Therefore Not to a Claim for a Contingent Bonus That Could Have Been Earned Under a Breached Employment Contract.** The Nonpayment of Wage Act, with its authorization for treble damages and attorneys fees, M.G.L.c. 149, §148, applies only to noncontingent compensation and therefore does not apply to a future bonus payable to a former key employee pursuant to an employment contract if the employee provides consulting services for a minimum number of days per year.

KOTTMYER, J. Susan F. Huebsch ("Plaintiff"), the executrix of the estate of Roger M. Huebsch ("Huebsch"), brought this action alleging that the defendant, Katahdin Industries, Inc. ("Katahdin") breached its employment contract with Huebsch. In Count II of the complaint, Plaintiff claims that Katahdin violated the Wage Act, G.L.c. 149, §§148, 150 (2000). Katahdin has moved, pursuant to Mass.R.Civ.P. 12(b)(6) (2000), to dismiss Count II on the grounds that it fails to state a claim upon which relief may be granted. Katahdin argues that, as a matter of law, the disputed portions of Huebsch's compensation are not covered by the Wage Act. For the reasons set forth below, the Defendant's motion to dismiss Count II is *ALLOWED*.

### BACKGROUND

On August 7, 1998 Roger Huebsch and Katahdin executed a written employment agreement ("the Agreement"), which Plaintiff attached to her complaint as Exhibit A.[1] Huebsch was to serve as a part-time consultant-employee for Katahdin. The Agreement specifically recognized that Huebsch was a "key" employee of the company. In return for his services, Katahdin agreed to pay Huebsch $42,500 for the first year (guaranteed first-year salary) and $21,250 for the second year (guaranteed second-year salary). This payment was "guaranteed" in that Katahdin was obligated to pay these sums to Huebsch regardless of Huebsch's death or disability and so long as the company did not terminate Huebsch's employment for cause. The Agreement stated that Katahdin would pay these sums incrementally—on the same schedule as other employees received payment.

The Agreement also provided for "contingent first year salary" and "contingent second year salary." In the first year, Huebsch would receive an additional $42,500 in a lump sum if he worked at least 100 days. In the second year, Huebsch would receive an additional $21,250 in a lump sum if he worked at least 20 days. The Agreement used the term "contingent" to describe these payments.

The Agreement then defined Huebsch's rights upon the occurrence of certain events. If Huebsch were to become disabled and was unable to perform his duties, Katahdin was obligated to continue payments of the guaranteed salaries until the end of the contract term. If Huebsch were to die during the term of employment, Katahdin was obligated to pay both the guaranteed and contingent salaries for the first year, and the guaranteed second year sum.

According to the complaint, Huebsch worked "at least 90 days" in the first year and "was available for work on numerous other days, if called upon by the Board to do so." On April 9, 1999, however, four months before Huebsch's first year of employment ended, Katahdin terminated his employment without cause. The complaint then asserts that Katahdin has paid Huebsch a total of $56,000 and alleges that this amount

fails to satisfy both the guaranteed payment and the sum of the guaranteed and contingent payments. On August 12, 1999, Huebsch died. On July 20, 2000, Huebsch's estate filed a non-payment of wages complaint with the Office of the Massachusetts Attorney General. The Attorney General declined to pursue an enforcement action pursuant to the Wage Act, but, without "making a judgment on the merits of [the] complaint," authorized the instant action against Katahdin.

### DISCUSSION

Pursuant to Mass.R.Civ.P. 12(b)(6), a court will dismiss a complaint for failure to state a claim where "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cacciola v. Nellhaus*, 49 Mass.App.Ct. 746, 749 (2000) (quoting *Nader v. Citron*, 372 Mass. 96, 98 (1977)). The court must accept as true the well pleaded allegations of fact in the complaint and any inferences in the plaintiff's favor that can be drawn therefrom. See *Schaer v. Brandeis University*, 432 Mass. 474, 477-78 (2000). Thus, a plaintiff will prevail over a motion to dismiss "unless it appears with certainty that he is entitled to no relief under any combination of facts that could be proved in support of his claim." *Brum v. Town of Dartmouth*, 44 Mass.App.Ct. 318, 322 (1998). "In passing on a rule 12(b)(6) motion, the court is not to consider the unlikelihood of the plaintiff's ability to produce evidence to support otherwise legally sufficient complaint allegations, however improbable appear the facts alleged, and 'notwithstanding expressions of denial and incredulousness as to ultimate proof by the defendants.'" *Id.* (internal citations omitted).

The Wage Act provides:

> Every person having employees in his [or her] service shall pay weekly or bi-weekly each such employee the *wages earned* by him to within six days of the termination of the pay period during which the wages were earned . . . but . . . any employee discharged from such employment shall be paid in full on the day of his discharge . . . The word "wages" shall include any holiday or vacation payments due an employee under an oral or written agreement . . . Whoever violates this section shall be punished or shall be subject to a civil citation.

G.L.c. 149, §148 (2000) (emphasis added).[2] The legislative purpose of the Wage Act was to mandate prompt payment of earned wages to employees at regular intervals—primarily weekly intervals.[3] *American Mutual Liability Ins. Co. v. Commissioner of Labor & Ind.*, 340 Mass. 144, at 146-49 (1959); *Dennis v. Jager, Smith & Stetler, P.C.*, 11 Mass. L. Rptr. 567, 2000 WL 782946 at *1 (Ball, J. April 10, 2000).

Plaintiff argues in the alternative 1) that the sum of the first year guaranteed salary ($42,500) and the first year contingent salary ($42,500) exceeds $56,000, thus

*The Massachusetts Law Reporter*
Cite as 13 Mass. L. Rptr. No. 8, 182 (July 2, 2001)

establishing that Katahdin "withheld" the excess in violation of the Wage Act; 2) the first year ($42,500) and second year ($21,250) guaranteed salaries were not contingent and Katahdin's failure to pay the total of the two violated the Wage Act, and 3) Huebsch's termination without cause and his death constituted the happening of contingencies entitling Huebsch to payment of the first-year guaranteed and contingent salaries and the second-year guaranteed payment under the Agreement. None of these arguments has merit.

Wages, as the term is used in the Act, "are money to which the employee has an absolute right; it is 'his [or her] property . . . not subject to any limitations, contingency, or delay' " in payment. *Boston Police Patrolmen's Ass'n, Inc.*, 1999 WL 1260164 at *5, quoting *Campbell v. Boston*, 290 Mass. 427, 430 (1935); *Dennis v. Jager, Smith & Stetler, P.C.*, 11 Mass. L. Rptr. 567, 2000 WL 782946 at *1 (Ball, J.) (April 10, 2000) (compensation "triggered by contingencies" falls outside the scope of the Wage Act); *Cumpata v. Blue Cross Blue Shield of Massachusetts, Inc.*, 113 F.Sup.2d 164, 167 (D.Mass. 2000).[4] In the same vein, the Appeals Court has described wages as regular and insubstantial, as compared with bonuses or commissions that are episodic and substantial.[5] *Commonwealth v. Savage*, 31 Mass.App.Ct. 714, 716 (1991) (holding that a real estate broker's commission was not a wage because the commission was episodic and substantial); see also *Dennis, supra*, 2000 WL at *1 (stating that the Wage Act does not afford protection to payments of a "substantial and irregular" nature). The fulfillment of a contingency is, by nature, episodic rather than regular.

The second $42,500 payment in the first year was a substantial and episodic payment subject to a contingency that Huebsch had not satisfied. The Agreement obligated Katahdin to pay the additional $42,500 upon the completion of 100 days work by Huebsch in the first year. Huebsch's complaint alleges that he work 90 days, thus failing to satisfy the condition precedent to the contingent salary. Further, under the terms of the agreement, Katahdin was not obligated to pay Huebsch any portion of the second-year guaranteed or contingent salary until the second year.

Moreover, the Wage Act expressly states that it applies only to wages earned by the employee. Huebsch did not work during the second year and therefore did not earn any part of the second-year salary. Any right Huebsch had to the guaranteed second year salary is based on contract. Similarly, any right to payment that resulted from Huebsch's termination without cause or death was created by the Agreement, not because Huebsch had earned this compensation before his employment was terminated. The payments which plaintiff seeks to recover in this action were not "wages" covered by G.L.c. 149, §148.

ORDER

For the foregoing reasons, Defendants' motion to dismiss Count II is hereby *ALLOWED*.

[1]The authenticity of the Agreement is not disputed. In ruling on a motion to dismiss, the court may consider documents referred to in plaintiff's complaint without converting a motion to dismiss into a motion for summary judgment. *Hahren v. Brown*, 431 Mass. 838, 839-40 (2000), citing, *inter alia, Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996).

[2]The Act also provides an enforcement mechanism:

[a]ny employee claiming to be aggrieved by a violation of section 148 . . . may . . . institute and prosecute in his own name and on his own behalf, or for himself and for others similarly situated, a civil action for injunctive relief and any damages incurred, including treble damages for any loss of wages and other benefits. Any employee so aggrieved and who prevails in such an action shall be entitled to an award of the costs of litigation and reasonable attorney fees.

G.L.c. 149, §150 (2000).

[3]The Act was entitled "An Act relative to the weekly payment of wages." *American Mutual Liability Ins. Co.*, 340 Mass. at 143-44.

[4]In *Cumpata* the plaintiff, a sales executive, was involved in an Incentive Compensation Plan in which he received bonuses for exceeding his sales quotas. See *id.* at 167. He argued that his employer violated the Act when it paid him a 20% bonus on a sale, rather than the 40% to which he was entitled under his contract. See *id.* The court held that the disputed bonus was a contingent payment not covered by the Wage Act because it was above and beyond plaintiff's regular salary, and because it was calculated quarterly (as opposed to regularly), and because involvement in the plan was voluntary. See *id.* at 168. The court held that the payment was not a wage under G.L.c. 149, §148, even though the plaintiff had fulfilled the contingency.

[5]The Wage Act applies only to commissions where the amount has been definitely determined and has become due and payable to the employee. §148.

---

**Wilson Lee v. Klysler Yen et al.**

Superior Court, Suffolk, SS

No. 995379A

Memorandum Dated March 30, 2001

**Torts – Libel and Defamation – In General – Speaker Cannot Recover in Defamation for the Costs of Defending an Earlier Defamation Action Brought Because of Negligent Reporting by a Newspaper.** A speaker who was sued for defamation based on a quotation concerning a third party inaccurately reported by a newspaper cannot recover the costs of defending the action from the newspaper on a theory of defamation, because one element of a claim of defamation is that the statement upon which the claim is based must have been "of and concerning" the claimant; here the statements were about a third party.

**Torts – Libel and Defamation – Public Figures – Rule Requiring that a Public Figure Prove Actual Malice Applies to Negligence as Well as Defamation Claims Against a Newspaper.** The rule, normally

# EXHIBIT

# F

[4]The dates of these documents indicate that Wetherbee did not have them either at the time of his initial denial of Costerus's application or at the time of his subsequent denial on reconsideration. Whether he had the underlying information does not appear.

[5]In his memorandum in this Court, Costerus asserts that in the context of the criminal case arising from the incident on March 21, 1999, the District Court suppressed evidence seized as" 'fruit of the poisonous tree' because the Concord Police failed to give Costerus his *Miranda* warning." Other than the District Court's reference in its decision to evidence having been suppressed, the record provides neither support for nor explanation of this assertion. In particular, the record does not disclose what was suppressed, or on what ground.

[6]The District Court judge made a consistent but not identical endorsement on Wetherbee's cross-motion.

[7]The District Court record reflects a complaint for contempt filed by Wetherbee on July 11, 2000, and an order of the Court issued on July 21, 2000, as follows: "After hearing, Motion for contempt is Denied. Deft's opposition to Plff's request for the issuance of a civil contempt summons—finding no basis for contempt the motion is allowed. Deft's request for fees is denied."

[8]The current statute leaves some doubt whether the District Court is limited to the record before the licensing authority, as is usual in judicial review of administrative decisions, or whether the District Court is authorized to hear evidence, find facts, and then determine whether the licensing authority's decision is reasonable on the facts found, as occurred under the previous version of the statute. See *Chief of Police of Shelburne v. Moyer*, 16 Mass.App.Ct. at 546-47. Here, since the District Court decided the matter on cross motions for summary judgment, the facts available for its consideration were limited to those established as undisputed. See generally, *Kourouvacilis v. General Motors Corp.*, 410 Mass. 706, 716 (1991). In this context, the substantial evidence test, referred to in the District Court's decision, had no application.

[9]The information Wetherbee obtained subsequently, regarding an undisclosed arrest at Logan Airport on a firearms charge, would tend to confirm this impression. Here again, the absence of any conviction, and the sealing of the record, are hardly dispositive.

---

**Brian Locke v.
Sales Consultants of Boston, Inc. et al.[1]**
Superior Court, Middlesex, SS
No. CA984081
Memorandum Dated April 13, 2001

**Master and Servant – Weekly Payment of Wages Act – In General – Act Does Not Apply to a Sales Commission Payable Quarterly or Subject to Contingencies.** The Nonpayment of Wages Act, M.G.L.c. 149, §148, is limited to compensation that is part of a weekly wage, and to compensation that is not subject to contingencies. The Act, therefore, does not apply to a sales commission that is payable quarterly, is contingent as to amount because the rate varies with the level of sales, or is contingent as to amount because of authorized deductions for canceled transactions.

HINKLE, J. This matter is before the court on the motion of the defendants, Sales Consultants of Boston, Inc. ("SCB") and its President, Robert G. Stockard,

for summary judgment. Plaintiff Brian Locke alleges retaliatory discharge in breach of G.L.c. 151B, §§4(4), 4(4A) and 4(5) (Counts I—III), wrongful termination (Count IV) and non-payment of wages under G.L.c. 149, §§148 and 150 ("the Wage Act") (Count V).

After hearing, for reasons set forth below, the motion for summary judgment is *ALLOWED* on the Civil Rights Act and Wage Act claims and *DENIED* on the wrongful termination claim.

BACKGROUND[2]
A. Plaintiff's Hiring

As a personnel placement company, SCB searches for employee-candidates and places them, as permanent employees, with employer-clients. For its services SCB is paid a fee by the client based upon successful placement of a candidate. At all relevant times, Stockard served as SCB's President and as President of Sales Staffers International, Inc. ("SSII"), which provides temporary but not permanent placements.

In January 1997, Stockard hired plaintiff as an SCB Account Executive. Plaintiff had responsibility for attracting clients and recruiting qualified candidates for placement. As each Account Executive at SCB is assigned to a specialty, plaintiff was assigned to the software industry. He, therefore, focused most of his work at SCB on recruiting software candidates.

On January 3, 1997, SCB and plaintiff executed an Account Executive Employment Agreement (the "Agreement") setting forth, among other things, plaintiff's compensation. The Agreement provides that plaintiff would be paid a base salary of $20,000 plus quarterly commissions on a sliding scale ranging from 5 to 25 percent of SCB's "net cash-in," depending on volume. Agreement A ¶1(a).[3] If there is a "fall off," i.e. the employee candidate never starts work or leaves during a specified guarantee period, no commission is paid. Under such circumstances, if SCB has already paid the commission, the Account Executive must return it. ¶1(d).

If an Account Executive's employment ends, the procedure changes. In most termination situations, an Account Executive is limited to 10 percent of net cash-in received by SCB within 30 days of the last day of employment, if there has been no fall-off. ¶2(a) and (c). If an employee breaches a restrictive covenant in the Agreement or an "apparent danger" exits of such a breach, the commission will be based only on the net cash-in received by SCB on or before the last day the Account Executive works. ¶2(b).

B. SCB's Referral of Media One Account to SSII

On April 15, 1997, plaintiff contacted a prospective client, Continental Cablevision/Media One ("Media One"). The Media One contact asked to speak with the owner of SCB, so plaintiff brought the matter to Stockard and made a telephone introduction of Stockard to the Media One contact. After learning that Media One was looking for part-time workers, which

was not SCB's business, Stockard referred the Media One account to SSII, which handles part-time staffing. After the referral, plaintiff did no further work for Media One.

Stockard told plaintiff he would be compensated for the Media One referral and "if it turned into a viable contract, then the cash in would fall into his [plaintiff's] normal commission schedule." Stockard Dep. at 113. Plaintiff assumed he would be compensated under the terms of the Agreement as he would for any placement. Plaintiff Dep. II at 23.

### C. The Retaliation Claim

On July 9, 1997, plaintiff attended an awards ceremony in the cafeteria shared by SCB and SSII. There, he witnessed an incident involving two SSII employees, Richard Nardella and Kimberly Balamotis. Plaintiff observed Nardella, then a vice president of SSII, pull a strap on the back of Balamotis's dress. When Balamotis asked Nardella what he was doing, Nardella said "I'm just trying to tie you up." Plaintiff Dep. I at 175. Balamotis then asked plaintiff "Did you see that? Now you know what I'm talking about. You're my witness." Plaintiff Affidavit ¶24.[4]

Plaintiff subsequently encouraged Balamotis to consult an attorney and went with her to the office of an attorney located in the same building as SCB.

On July 14, 1997, Balamotis complained about Nardella's conduct to Stockard. Stockard then initiated an investigation and suspended Nardella pending its outcome. After learning that plaintiff witnessed the event, Stockard asked plaintiff to put his observations in writing. Plaintiff submitted his observations on July 15, 1997. Plaintiff's written submission describes what occurred in the cafeteria between Balamotis and Nardella but does not mention her subsequent consultation with counsel. Until Stockard asked plaintiff to record his observations, plaintiff had not mentioned the Balamotis incident to Stockard.

### D. Plaintiff's Discharge

On July 17, 1997, two days after plaintiff gave his written statement to Stockard regarding the Balamotis/Nardella incident, Stockard told plaintiff that his position was being eliminated. Stockard offered to let plaintiff resign and told him that otherwise he would be terminated. Under these circumstances, plaintiff chose to resign.

Defendants allege plaintiff's position at SCB was eliminated because the software industry was unprofitable and SCB intended to expand its efforts to the medical/pharmaceutical industry. Defendants claim that after elimination of plaintiff's position, SCB neither sought nor hired anyone to recruit in the software industry. Stockard Affidavit ¶7. On September 28, 1997, SCB advertised for an Account Executive. Plaintiff Affidavit ¶5.

### E. The Commission Issue

After plaintiff's departure from SCB, SSII received two checks from Media One, one dated July 30, 1997 for $19,323.00, and one dated August 26, 1997 for $3,750.00. Plaintiff was not paid any commission on these amounts.

On August 15, 1997, SCB issued plaintiff a partial commission check for a placement plaintiff made with a company called S2 Systems, Inc. ("S2"). On or about August 20, 1997, plaintiff filed a complaint for non-payment of wages with the Office of the Attorney General under G.L.c. 149, §148. On or about September 2, 1997, SCB stopped payment on the S2 check. SCB claims that payment was stopped because Stockard learned that there had been a fall off. Stockard Dep. at 90, 94. This fact is disputed. An affidavit of Denise Ward, a human resources manager at S2, states that the candidate in question was hired on June 30, 1997 and employed with S2 as of August 30, 1999.

In addition to claiming he was not paid commissions for the Media One and S2 accounts, plaintiff contends that he is owed commissions for two placements he made with a company known as "RoweCom." Plaintiff Affidavit ¶38. SCB contends that it "has no records indicating that a company known as RoweCom was ever a client or ever made any payment to SCB." Stockard Affidavit ¶10.

### F. MCAD Filings

On or about December 23, 1997, plaintiff filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD"). On August 6, 1998, plaintiff filed this action. On July 7, 1999, plaintiff requested that MCAD dismiss his complaint so he could pursue the discrimination claim in this Court. On September 20, 1999, the MCAD dismissed plaintiff's complaint.

On or about August 1, 1997, Balamotis filed a charge of discrimination with the MCAD. On July 31, 2000, MCAD dismissed Balamotis's complaint for lack of probable cause.

### DISCUSSION

The court allows summary judgment where there are no disputed issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. See *Cassesso v. Comm'r of Correction*, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. See *Pederson v. Time, Inc.*, 404 Mass. 14, 17 (1989). On matters for which the moving party does not bear the burden of proof at trial, the moving party may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party's case or by showing that the moving party has no reasonable expectation

of proving an essential element of its case. See *Kourouvacilis v. General Motors Corp.*, 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. See *Pederson*, 404 Mass. at 17. The nonmoving party cannot defeat a motion for summary judgment by resting on his pleadings and mere assertions of disputed facts. See *LaLonde v. Eissner*, 405 Mass. 207, 209 (1989).

In deciding a motion for summary judgment, the court may consider pleadings, depositions, answers to interrogatories, admissions on file and affidavits. See *Community Nat'l Bank v. Dawes*, 369 Mass. 550, 553 (1976).

### I. Breach of Good Faith and Fair Dealing/Constructive Termination

In Count IV, plaintiff asserts that SCB breached the implied covenant of good faith and fair dealing in terminating him. This claim cannot be resolved on summary judgment. Whether SCB constructively discharged plaintiff, whether SCB terminated plaintiff in bad faith, and whether SCB took any action regarding plaintiff's employment to deprive him properly owed commissions are disputed factual issues.

### II. The Wage Act Claim

In Count V, plaintiff contends that defendants violated the Wage Act because SCB did not pay him commissions for placements made before his resignation. The Wage Act provides in relevant part: "[I]n no event shall wages remain unpaid by an employer for more than six days from the termination of the pay period in which such wages were earned by the employee." G.L.c. 149, §148. The Act "shall apply, so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee." *Id.* Defendants contend that the commissions in question fall outside the Wage Act because the commissions were payable on a quarterly basis.

The local Federal Court addressed this issue in *Cumpata v. Blue Cross Blue Shield of Massachusetts*, 113 F.Sup.2d 164 (D.Mass. 2000). Judge Young, after noting the historical restriction of the Wage Act's application to monies that were part of "weekly income," held that quarterly commissions fell "outside the protection of the Wage Act" and granted summary judgment to the defendant employer on that claim. *Id.* at 168-69. In reaching his conclusion, Judge Young also relied on the "triggered by contingencies" line of cases since the commissions were earned only when certain sales targets were reached. *Id.*

The same reasoning applies here. Locke's commissions were calculated and paid quarterly, while his regular paycheck was paid according to the schedule mandated by §148. See Defendants' Statements in Support of Undisputed Facts and Legal Elements at ¶13. The percentage of fees Locke earned as commissions was contingent on his production that quarter. According to the Agreement, commissions could be eliminated before, or even after, they were paid to Locke depending on the success of the candidates he placed with clients.

Therefore, Locke's claim fails because it is outside the intended scope of the Wage Act as it is for compensation paid quarterly rather than weekly and triggered by numerous contingencies.

### III. The Retaliation Claims

In Counts I, II and III, plaintiff contends that defendants are liable for retaliatory discharge under G.L.c. 151B, §§4(4), 4(4A), and 4(5). Plaintiff's theory is that he was terminated for "opposing" SCB's sexual harassment and for "aiding" Balamotis.[5] Defendants argue that plaintiff cannot establish a *prima facie* case of retaliation because no evidence in the record shows an adverse employment action was taken against plaintiff due to his engagement in an activity protected by G.L.c. 151B.

To establish a *prima facie* case of retaliation under G.L.c. 151B, plaintiff must demonstrate that he reasonably and in good faith believed that defendants were engaged in wrongful discrimination, that he acted reasonably in response to his belief, and that defendants' desire to retaliate against him was a determinative factor in the decision to terminate his employment. See *Tate v. Department of Mental Health*, 419 Mass. 356, 364 (1995).

Applying this standard, plaintiff fails to raise a triable issue as to whether his role in the Balamotis/Nardella incident played any part in SCB's decision about his continued employment. First, there is no evidence that defendants knew about plaintiff's meeting with Balamotis's attorney or that he had anything to do with that meeting. Second, plaintiff of his own initiative did nothing with regard to notifying SCB of the incident. Stockard learned about Nardella's behavior from Balamotis. Plaintiff merely complied with Stockard's request to describe, first orally and then in writing, what he had witnessed. Following instructions to cooperate with an internal investigation undertaken by an employer is not "opposition" to unlawful employer behavior within the meaning of G.L.c. 151B.

Thus, from the record before me, no evidence exists to infer that on July 15, 1997, when Stockard met with plaintiff about termination of his employment, Stockard or SCB was retaliating because of plaintiff's role in the Balamotis incident.

Similarly, plaintiff cannot show he had a good faith and objectively reasonable belief that SCB was engaging in discriminatory behavior. Plaintiff witnessed a single incident between two employees of SSII. Based

on that, no reasonable person would conclude that SCB or Stockard was engaging in unlawful discrimination.

Since plaintiff's claim that SCB breached G.L.c. 151B fails, his claim that Stockard aided and abetted the purported violation also fails.

### ORDER

For the foregoing reasons, defendants' motion for summary judgment is *ALLOWED* as to Counts I-III and Count V. Defendant's motion is *DENIED* as to Count IV.

[1] Robert J. Stockard.

[2] These facts are undisputed unless noted or are stated in the light most favorable to plaintiff.

[3] "Net cash-in" is defined in the Agreement as the amount received and retained by SCB through an Account Executive's "sole efforts" at placement minus certain expenses. ¶1(c).

[4] Plaintiff heard Nardella make inappropriate statements to Balamotis on two previous occasions. See Plaintiff's Answers to Interrogatories ¶11.

[5] General Laws c. 151B, §§4(4) and 4(4A) provide in relevant part:

It shall be an unlawful practice:

4. For any person, employer, labor organization or employment agency to *discharge*, expel or otherwise discriminate against any person *because he has opposed any practices forbidden under this chapter* or because he has filed a complaint, testified or assisted in any proceeding under section five.

4A. For any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter, *or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter.*

(Emphasis added.)

General Laws c. 151B, §4(5) provides in relevant part:

It shall be an unlawful practice:

5. For any person, whether an employer or an employee or not, to aid, incite, compel or coerce the doing of any acts forbidden under this chapter or attempt to do so.

Plaintiff alleges that Stockard aided and abetted SCB's retaliation by making the decision to discharge him.

---

## Terrence O'Kelly et al. v. BASF Magnetics Corporation et al.

Superior Court, Middlesex, SS
No. CA002527
Memorandum Dated April 13, 2001

**Limitations of Actions – Particular Matters – Employment Termination Claims – Claim of Termination in Violation of Public Policy Is Subject to the Three-year Limitation Period for Torts Rather than the Six-year Period for Breach of Contract.**
**Master and Servant – Employment Termination Claims – Termination in Violation of Public Policy – Claim Is Subject to the Three-year Limitations Period for Torts Rather than the Six-year Period**

**for Breach of Contract.** A claim of termination in violation of public policy is subject to the three-year statute of limitations for torts, M.G.L.c. 260, §2A, not the six-year statute for contracts, because the claim is based on the violation of duty created by law to implement a social policy rather than by the voluntary agreement of the parties.

---

FABRICANT, J. After hearing on the defendants' motions to dismiss, and review of all materials submitted, the Court concludes the motions must be allowed in part and denied in part, as follows.

For purposes of a motion to dismiss pursuant to Mass.R.Civ.P. 12(b), the allegations of fact in the complaint must be treated as true, with all reasonable inferences drawn in favor of the plaintiffs. See *General Motors Acceptance Corp. v. Abington Casualty Ins. Co.*, 413 Mass. 583, 584 (1992). Characterizations and conclusions of law, however, warrant no such consideration, and may be disregarded. See e.g. *Boston & M.R.R. v. County Com'rs of Middlesex County*, 239 Mass. 127, 131 (1921). A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *General Motors Acceptance Corp. v. Abington Casualty Ins. Co.*, 413 Mass. at 584, quoting *Nader v. Citron*, 372 Mass. 96, 98 (1977), quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

The complaint alleges, in substance, that the defendant BASF Magnetic Corporation terminated the plaintiff Terence O'Kelly from his at-will employment as of December 1996, and prevented his employment with its corporate successor, in retaliation for his refusal to engage in illegal price fixing. The alleged refusal occurred, according to the complaint, in response to a series of requests between 1992 and 1995 from the employer's foreign parent. As a result of his wrongful termination, the complaint alleges, Terence O'Kelly suffered "substantial losses in earnings, employment benefits and other incidental financial losses," as well as "humiliation, embarrassment, damage to reputation, emotional distress, headaches, sleeplessness, and anxiety," and his wife Deborah O'Kelly suffered loss of consortium. The complaint further alleges that the plaintiff first discovered the reason for his termination in November of 1999, when attorneys for the employer showed him evidence from which he concluded that "his superiors at BASF had participated in an illegal price fixing scheme with their competitors." Based on these allegations, the complaint asserts eight counts[1] against the plaintiff's former employer, his former superior in that corporation, and the employer's corporate successor.[2]

The primary thrust of the present motions is that the complaint is barred by the statute of limitations, having been filed on May 31, 2000, more than three years after the December 1996, termination of the

# EXHIBIT

# G

Case 1:02-cv-11773-NG  Document 4  Filed 09/12/02  Page 55 of 56

*The Massachusetts Law Reporter*     567
Cite as 11 Mass. L. Rptr. No. 24, 567 (July 17, 2000)

to do so must be made sparingly, and when chosen, may only be on account of *procedural defect* such as fraud, misrepresentation, misconduct, or additional evidence. See *Aronson v. Brookline Rent Control Board*, 19 Mass.App.Ct. 700 (1985), *Covell v. Department of Social Services*, 42 Mass.App.Ct. 427 (1997). The Appeals Court has proposed an analogy to Rule 60(b) of the Rules of Civil Procedure for such situations. *Aronson* at 43. Rule 60(b) only offers relief from a judgment where there was some *procedural defect* in the original adjudication such as newly discovered.

The Division has argued that the Commissioner should retain this ability to order a rehearing if he or she disagrees with the decision because the DMA may not seek judicial review of the decision under G.L.c. 30A, §14. Under G.L.c. 118E, §47, however, the decision of the hearing officer is the decision of the DMA. The Commissioner is authorized by statute to either conduct a hearing on a MassHealth appeal himself or herself or delegate it to the Board of Hearings. When the Commissioner delegates a hearing to a referee, however, he or she cannot later usurp the hearing decision from that referee because he or she disagrees. Where the hearing is conducted by the Board of Hearings, "such appeals, hearings, and decisions shall be subject to the provisions of Section 48. M.G.L.c. 118E, §47. Section 48 states that "*neither the director nor any other employee* of the division *shall review*, interfere with, change or attempt to influence *any hearing decision by a referee*. M.G.L.c. 118E, §48. Thus, the statute indicates that where the Commissioner delegates a hearing to a referee, the Commissioner does exactly that, he or she delegates the decision of the merits of the appeal to that referee.

Notably, the statute does not contain any language which would support the DMA's argument that the Commissioner may second-guess a hearing officer's decision if he or she disagrees with the result. Section 48 does not state that the Commissioner may review the referee decision. Section 48 does not state that the Commissioner may choose whether to adopt the referee's decision as the decision of the division. Section 48 states exactly the opposite, that where the Commissioner delegates a hearing to the Board of Hearings, the Hearing Officer makes the decision, and that decision is the decision of the division. The Commissioner may not put an applicant through a farcical hearing and wait for the hearing result before deciding whether to decide the merits of the appeal. If "good cause" means "disagrees with the result," the language of Sections 47 and 48 is rendered meaningless.

### IV. ORDER

Accordingly, it is *ORDERED*, that the decision of the Division of Medical Assistance denying Mrs. Cronin's application for Medical Assistance benefits be reversed and it is further *ORDERED*, that the Division of Medical Assistance declare Mrs. Cronin eligible for Medical Assistance benefits effective September 1, 1998.

[1] The DMA's reliance on the fact that the Realty Trust can be revoked or amended is misplaced. The revocability or amendability does not cause a trust to be available to a MassHealth applicant where such a revocation or amendment would constitute a breach of fiduciary duty to the beneficiaries. If Mrs. Waterhouse revoked or amended the Realty Trust in order to provide assets to Mrs. Cronin, she would violate her fiduciary duty to the beneficiaries of the Irrevocable Trust.

[2] The assets of a trust are only considered available to the applicant where the trustee has discretion by the terms of the trust to pay the trust principal to the applicant. See 42 U.S.C. l396p. HCFA Transmittal No. 64, 130 CMR 521 through 524.

---

### John P. Dennis v. Jager, Smith & Stetler, P.C., et al.[1]

Superior Court, Suffolk, SS
No. 984974G
Memorandum Dated April 10, 2000

**Attorneys – Compensation – Misc. Cases – Weekly Payment of Wages Act Does Not Apply to Professionals Such as Attorneys.**

**Master and Servant – Wages – Action to Recover Wages – Weekly Payment of Wages Act Does Not Apply to Professionals Such as Attorneys.** The Weekly Payment of Wages Act, with its authorization for treble damages and attorneys fees for an employer's failure to pay wages, M.G.L.c. 149, §148, is limited to categories of employees that are vulnerable to employer intimidation, such as laborers and casual wage earners, and does not apply to highly paid professionals. The Act, therefore, does not apply to claims by an attorney against an employing law firm.

**Master and Servant – Wages – Action to Recover Wages – Weekly Payment of Wages Act Does Not Apply to Compensation that Is Substantial, Irregular and Contingent.** The Weekly Payment of Wages Act, M.G.L.c. 149, §148, does not apply to compensation that is substantial, irregular and contingent. The Act, therefore, does not apply to claims by an attorney to be entitled to substantial contingent salary from a former employing law firm.

BALL, J. This case involves the resignation and departure of John P. Dennis ("Dennis"), a contract attorney, from the defendant law firm Jager, Smith & Stetler, P.C. ("JSS"), after four years of employment. Dennis brings suit claiming he is owed money for work performed during his employment with JSS. Defendants counterclaim alleging a breach of fiduciary duty by Dennis.

As to the cross motions for summary judgment pending before the court, there appear to be questions of fact outstanding. In any event, any partial allowance of summary judgment would serve little purpose as regards judicial economy, since virtually all of the evidence exhaustively argued would be admissible at

*The Massachusetts Law Reporter*
Cite as 11 Mass. L. Rptr. No. 24, 568 (July 17, 2000)

the trial of any one of the claims or counterclaims asserted—with one exception.[2]

The exception is Dennis's claim that the Weekly Payment of Wages Act (the "Wage Act"), G.L.c. 149, §148, which allows for the collection of treble damages and attorneys fees, applies here; this is a question of law. To determine an act's purpose, it is appropriate to consider the caption of the act. *Commonwealth v. Savage*, 31 Mass.App.Ct. 714, 716 & n.4 (1991). The legislative purpose behind enactment of the Wage Act was to mandate prompt payment of earned wages to employees at regular intervals—primarily weekly intervals, as indicated in the caption. *See American Mutual Liability Ins. Co. v. Commissioner of Labor and Industries*, 340 Mass. 144, 147 (1957). *See also* G.L.c. 149, §§148-150. For instance, the Wage Act would be applicable to the payment of weekly wages to secretaries in a law firm. The Wage Act does not, however, apply to disputes over "bonuses potentially owing to highly paid executives, who [are] confident enough to resign their employment if their demands . . . [are] not met." *Baptista v. Abby Health Care Group, Inc.*, Civ. Action No. 95-10125-RGS, at 9 (U.S.D.C., D.Mass., Apr. 10, 1986) (Stearns, J.). As Judge Steams stated in *Baptista*, "the only impression that can possibly be derived from M.G.L.c. 149, §§148, 150, is that its intent is to protect laborers and casual wage earners who might otherwise be vulnerable to employer intimidation." *Id.* at 8. There is no reason to extend to highly paid professionals the opportunity to collect treble damages and attorneys fees and costs incurred in enforcing their asserted contract rights. *Id.*

Moreover, the annual compensation at issue here is not a "wage" under the Wage Act. Courts have distinguished wages, which include assured compensation and compensation equivalents such as accrued vacation pay and sick leave, from compensation "triggered by contingencies" and thus outside the scope of the Wage Act. See *Baptista*, at 8-9. Here, Dennis' compensation was contingent on a number of factors. Neither is Dennis' annual compensation a "commission" covered by the act. The term "commission" in the Wage Act has been used in reference to "employees who would ordinarily be paid on a weekly basis, such as retail salespeople, and for whom commissions constitute a significant part of weekly income." *Commonwealth v. Savage*, 31 Mass.App.Ct. 714, 716 (1991). Unlike such commissioned sales employees who are paid weekly, lawyers such as Dennis receive substantial and irregular compensation, in the form of a draw, that is not afforded the protections of the Wage Act.[3]

Because the facts as alleged, if true, would not establish a violation of the Wage Act since Dennis' compensation falls outside its scope and purpose, summary judgment will be allowed on that count.

### ORDER

In light of the foregoing, it is hereby ordered that summary judgment is ALLOWED as to Count I of the plaintiff's complaint and DENIED as to the remainder of the claims and counterclaims.

---

[1] Edward G. Jager, Bruce F. Smith, and Ronald N. Stetler.

[2] Aside from the Weekly Payment of Wages Act claim discussed below, Dennis' claim of breach of the implied covenant of good faith and fair dealing is also worthy of mention. In the context of at-will employment, Massachusetts courts have applied this doctrine only where an employer has terminated an employee to deprive him of commissions due or compensation for work performed. See *Sellig v. Visiting Nurse & Community Health, Inc.*, 10 Mass. L. Rptr. 231, 1999 WL 515795, **4 (Super. Ct. Jun. 10, 1999) (McHugh, J.), and cases cited. See also *McCone v. New England Telephone & Telegraph Co.*, 393 Mass. 231, 233-34 n.7 (1984). Here, there is evidence that compensation has been denied for work performed. Thus, this court denies summary judgment at this time in order to give the parties an opportunity at trial to determine whether there was a constructive discharge in this case.

[3] Dennis has cited New York cases in support of his contention that the Massachusetts Wage Act applies to attorneys' compensation. The rationale underlying the decisions in those cases contradict the legislative intent of the Massachusetts Wage Act, rely on a different definition of "wages" and are not controlling authority.

---

### David A. Nourse et al. v. Timothy M. Nourse et al.

Superior Court, Worcester, SS

No. 981113A

Memorandum Dated April 13, 2000

**Attorneys – Attorney/client Privilege – Privilege Does Not Bar Admission in a Will Contest of Communications Between the Deceased and the Drafting Attorney.**

**Discovery – Privileges – Attorney/client Privilege – Privilege Does Not Bar Admission in a Will Contest of Communications Between the Deceased and the Drafting Attorney.** The attorney/client privilege does not bar the admission in a will contest of communications between the deceased and the attorney who drafted the contested will.

BOHN, J. This action arises out of an estate plan by which a family farm was left solely to one of four siblings. The plaintiffs are the three siblings who challenge the estate plan, alleging that the four siblings were to inherit the family farm jointly but that, less than two weeks before his death, and subject to improper influence, the decedent changed his estate plan.

The subject of the within motion is Attorney Roger B. Leland, the decedent's attorney and confidante, who drafted the documents concerning the estate plan. On February 1, 1999, the plaintiffs served Leland with a deposition subpoena attaching a request to produce certain documents. On May 21, 1999, Leland turned over several client files on the matter, but refused to produce, as requested, his time entries, bills, telephone records, tape recordings, or bank account records concerning his services to the decedent.